Burton **SELMAN**, on behalf of himself and others similarly situated, Plaintiff,

v.

**HARVARD MEDICAL SCHOOL** et al., Defendants.

**No. 79 Civ. 0816 (KTD).**

United States District Court, S. D. New York.

May 20, 1980.

Leon Dicker, New York City, for plaintiff.

Baer, Marks & Upham, New York City, for defendant Association of American Medical Colleges; Barry J. Mandel, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendants; Floyd Abrams, Patricia A. Pickrel, Susan Buckley, Stuart Altschuler, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Burton Selman, was a medical student at Universidad Autonama of Guadalajara, Mexico [hereinafter referred to as "UAG"] whose transfer applications to numerous medical schools in the United States were rejected. The instant action was instituted in February, 1979, against several United States medical schools,[1] individual employees of those schools, and the Association of American Medical Colleges [hereinafter referred to as "AAMC"]. Selman brought suit on behalf of himself as well as all similarly situated qualified applicants from foreign medical schools who applied for admission to defendant medical schools under the "Federal Transfer Program" and were rejected.

Defendants have jointly moved to dismiss the complaint on four grounds. First, defendants contend that subject matter jurisdiction is lacking as to all defendants. Second, it is alleged that personal jurisdiction is lacking as to several of the individual defendants who are California residents.[2] Third, defendants argue that plaintiff has failed to state a claim upon which relief can be granted and to aver the circumstances constituting fraud with the degree of particularity required under Fed.R.Civ.P. 9(b). Finally, defendants charge that plaintiff's failure to join the Commissioner of Internal Revenue as an indispensable party at least as to the sixth cause of action requires its dismissal. In addition to the above motion in which AAMC has joined, AAMC has separately moved to dismiss for lack of *in personam* jurisdiction and failure to state a claim.

Plaintiff has cross-moved for an order certifying the action as a class action pursuant to Fed.R.Civ.P. 23(c)(1).

In his complaint, plaintiff lists seven causes of action all arising from similar allegedly illegal and unconstitutional admissions criteria used by defendant medical schools. The first cause of action appears to sound in contract. It is alleged that defendant medical schools failed to use the criteria for admission of transfer students set forth in various brochures sent to applicants. Rather, plaintiff maintains that unequal and arbitrary standards were used including, *inter alia*, preference given to those applicants who had "personal contacts" with members of the Admission Committees. Plaintiff argues that he and members of the class relied to their detriment on criteria published in these brochures.

Next, plaintiff argues in tort. He charges the defendants with intentional misrepresentation and intent to deceive and defraud.

Plaintiff's third cause of action is based on the Foreign Medical School Transfer Program. Health Professions Educational

---

1. The schools named as defendants in the complaint are: Harvard Medical School; Yale University School of Medicine; Stanford University School of Medicine; the John Hopkins University School of Medicine; Duke University School of Medicine; Cornell University Medical College; Columbia University College of Physicians and Surgeons; New York University School of Medicine; University of California, San Francisco, School of Medicine; University of California, Los Angeles, School of Medicine; and University of California, San Diego, School of Medicine.

2. The individual defendants who have so moved are: Dr. Julius Krevans, Dean of School of Medicine, University of California, San Francisco; Dr. John Watson, Associate Dean of School of Medicine, University of California, San Francisco; Dr. Sherman.Mellinkoff, Dean of School of Medicine, University of California, Los Angeles; Dr. Martin Pops, Associate Dean of School of Medicine, University of California, Los Angeles; Dr. John Moxley III, Dean of School of Medicine, University of California, San Diego; and Dr. Charles Spooner, Associate Dean of School of Medicine, University of California, San Diego.

Assistance Act Pub.L.No. 94–484, 90 Stat. 2243, 2296 (1976). It is interesting to note that this program which originally provided for a "Match List" matching qualified foreign medical school applicants with participating United States schools was repealed before it went into effect. Public Health Service Act Amendments Pub.L.No. 95–215, 91 Stat. 1503 (1977).

In its place, there is now a "capitation grant" program providing for annual grants to schools of medicine which comply with various requirements. 42 U.S.C. §§ 292 *et seq.* One such prerequisite to participation in the program is the assurance by participating medical schools that they will increase enrollment of full time third-year students. 42 U.S.C. § 295f–1(b) (Supp.1978). This provision would presumably encourage participating medical schools to accept transfer students from foreign schools.

It is contended that the above capitation program creates a federal statutory right to fair consideration, the violation of which may properly be redressed under 42 U.S.C. § 1983. Plaintiff maintains that the arbitrary admissions criteria used by defendant medical schools violate this statutory right as well as the due process clauses of the Fifth and Fourteenth Amendments.

Next, plaintiff alleges a conspiracy on the part of defendants to adopt discriminatory admissions policies in violation of 42 U.S.C. § 1985. Alleged overt acts in connection with this conspiracy include, *inter alia,* dissemination of misleading information and waiver of some requirements for certain applicants. In addition, plaintiff points to several personal gripes; e. g.: failure to consider plaintiff's timely change of address letters.

In a related cause of action, plaintiff charges defendants with unlawful combinations, contracts, and agreements in restraint of trade under the Sherman Act, 15 U.S.C. §§ 1 *et seq.* As part of these supposed unlawful combinations, defendants allegedly engaged in a successful "boycott" to change the "Match List" program thereby enabling them to consider applicants on the basis of their own arbitrary criteria. It is contended that defendants' unlawful activities prevent and prohibit free competition by preventing plaintiffs and members of the class the opportunity to become doctors. Consequently, the quality of health services available to the public is allegedly severely restricted.

In his sixth cause of action, plaintiff argues that defendants' tax exempt status as charitable organizations under the Internal Revenue Code, 26 U.S.C. § 501(c)(3), should be revoked. To further this contention, he argues that the named "medical schools are not operating for the benefit of members of the community generally, but for the benefit of a select class of persons." Complaint ¶ 73.

Finally, without specifying the statutes or constitutional provisions to which he is referring, Selman argues that defendants activities violate individual states' requirements of fairness in considering applicants for admission.

## I. Association of American Medical Colleges

### A. Failure to State a Claim

█ AAMC's first argument in its motion to dismiss is that it is merely named in the caption of plaintiff's complaint. Nowhere in any of the substantive paragraphs of the complaint, it alleges, is there any reference to AAMC. Contrary to this assertion, however, in the fourth cause of action, plaintiff does state that "all defendants further conspired to conceal said discrimination." Complaint ¶ 57.

"Notice pleading" provided for by the Federal Rules requires that complaints be liberally construed. *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1351 (2d Cir.), *cert. denied,* 417 U.S. 982, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). Here, the complaint was sufficient to give notice to AAMC that, at least, it was being included in the conspiracy charge.

Although there is a paucity of reference to defendant AAMC in the substantive portion of the complaint, I reluctantly must

conclude that this alone is not sufficient reason to dismiss the complaint against AAMC. My conclusion on this matter takes into account the ease with which the complaint could be amended under Fed.R.Civ.P. 15(a). *See International Controls Corp. v. Vesco, supra,* at 1351.

B. *In Personam* Jurisdiction

The AAMC is a non-profit, Illinois corporation whose only offices are located in Washington, D.C. It has 125 member medical schools, twelve of which are located in New York State.

The stated purpose of AAMC is "the advancement of medical education." To this end, AAMC, publishes journals, conducts research, and holds meetings and forums. Affidavit of John F. Sherman, Vice-President of AAMC, ¶ 4 (May 5, 1979) [hereinafter referred to as "Sherman Aff."]. Together with the American Medical Association, AAMC sponsors the Liaison Committee on Medical Education which accredits medical schools in the United States and Canada.

In addition, AAMC is involved in two programs related to medical school admissions. First, it developed the new Medical College Admissions Test [hereinafter referred to as "MCAT"] which is administered to those seeking admission to United States medical schools. The test is administered throughout the United States including several New York locations. This test is administered, however, by the American College Testing Program, Inc. [hereinafter referred to as "ACTP"], an Iowa corporation. AAMC indicates that the ACTP is an independent contractor over whom AAMC exercises no discretion or control.

AAMC also sponsors the "Coordinated Transfer Application System," [hereinafter referred to as "COTRANS"] and the "American Medical College Application Service" [hereinafter referred to as "AMCAS"]. These programs provide a centralized application processing service for appli-

cants to participating schools. Applicants submit the applications to AAMC in Washington, D.C. They are then forwarded to various designated medical schools.

AAMC owns no property, has no office, bank account, or telephone listing in New York. It is not qualified to do business in New York State and has not designated an agent for service of process there. Sherman Aff. ¶ 7.

Pursuant to Fed.R.Civ.P. 4(e), service upon a party not an inhabitant or found within the state may be made under the state law of the state in which the District Court is sitting. Thus, AAMC's motion to dismiss for lack of *in personam* jurisdiction must be tested against N.Y.Civ.Prac.Law §§ 301 and 302. (McKinney Supp.1980).

At the outset, it should be noted that once jurisdiction is challenged in an appropriate manner, plaintiff shoulders the burden of proof on the issue of personal jurisdiction. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936). Even during the preliminary stages of litigation, plaintiff must at least establish a prima facie case of transactions sufficiently related to the forum so as to make *in personam* jurisdiction proper. *United States v. Montreal Trust Co.,* 358 F.2d 239 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966).

The Second Circuit has consistently held that "[i]t is basic that the burden of proving jurisdiction is upon the party who asserts it and that he must show by the complaint and supporting affidavits the essential requirements of the jurisdictional statute . . . ." *Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 92 (2d Cir. 1975) (citations omitted).

Plaintiff has failed to show that *in personam* jurisdiction obtains under N.Y. Civ.Prac.Law § 301.[3] Under this subdivi-

**3.** This section reads:
A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore.

This section, therefore, incorporates the "presence" basis for jurisdiction including the corporate presence or "doing business" test. *Tauza v. Susequehanna Coal Co.,* 220 N.Y. 259, 115 N.E. 915 (1917).

sion, jurisdiction over a foreign corporation is proper if it is "doing business" within the state. This test has been interpreted by the New York Court of Appeals to require "doing business systematically and regularly with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917).

■ It is clear that AAMC is not directly doing business in New York State. It has no office, employees, telephone listing, or bank accounts and does not carry on regular activities in New York. It might be argued that the administration of AAMC's MCAT in the state on a regular basis is sufficient presence. It is well settled, however, that the mere shipment to or use of defendants' goods in a foreign state is not a sufficient basis for *in personam* jurisdiction over a foreign corporation. *Kramer v. Vogl*,[4] 17 N.Y.2d 27, 215 N.E.2d 159, 267 N.Y.S.2d 900 (1966). Similarly, the mere mailing of applications to New York medical schools on behalf of applicants is not sufficient "systematic and regular" business to satisfy the "doing business" test.

■ There is a question, however, as to whether or not AAMC is indirectly present in the state by way of an agent, representative, or related corporation. AAMC argues that ACTP which administers the MCAT at various locations in New York is an independent contractor over whom AAMC exercises no discretion or control. In fact, AAMC avers that ACTP "is an independent non-profit testing organization incorporated

in and having its offices and principal place of business in the State of Iowa." Sherman Aff. ¶ 8.

Plaintiff, on the other hand, contends that ACTP is a testing subsidiary of AAMC which is its agent in New York State for jurisdictional purposes. Yet, plaintiff has put forward no evidence of common ownership or control. There is also no suggestion of the existence of an agency agreement.

■ Where such evidence is lacking and "there exist truly separate corporate entities, a valid [inference] of agency cannot be sustained." *Delagi v. Volkswagenwerk AG of Wolfsburg Germany*, 29 N.Y.2d 426, 431, 278 N.E.2d 895, 897, 328 N.Y.S.2d 653, 656 (1972). Moreover, in order to be an agent for purposes of New York personal jurisdiction "the alleged agent must have acted in this state for the benefit of and with the knowledge and consent of the non-resident and the non-resident must exercise some element of control over the agent." *Louis Marx & Co. v. Fuji Seiko Co. Ltd.*, 453 F.Supp. 385, 390 (S.D.N.Y.1978) (footnote omitted).

Absent an agency agreement, common ownership or common control, I cannot conclude that ACTP's activities in New York State are those of an agent for purposes of jurisdiction. Consequently, I find that AAMC is not "doing business" in New York and cannot be subject to *in personam* jurisdiction under N.Y.Civ.Prac.Law § 301.

■ Similarly, jurisdiction over AAMC cannot be founded on the New York long-

---

4. *Kramer v. Vogl* involved a letter sent to New York confirming the contract and the shipment of goods into New York by an Austrian defendant. The New York Court of Appeals ruled that these contacts with the state alone were not sufficient to constitute the "transact[ion] [of] any business" pursuant to N.Y.Civ. Prac.Law § 302(a)(1). *A fortiori*, it is not sufficient to constitute "doing business" under the more restrictive § 301 test. See Weinstein-Korn-Miller, New York Civil Practice ¶ 302.07 (1977).

The New York long-arm statute has since been amended to provide for long-arm jurisdiction over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y.Civ.Prac.Law § 302(a)(1) (McKinney Supp. 1980). This change need not alter the conclusion that mere shipment of or use of defendants' goods in the state is not a sufficient basis for jurisdiction under the more rigid "doing business" test.

arm statute, N.Y.Civ.Prac.Law § 302.[5] AAMC's activities do not fit into any of the three basic subdivisions of § 302.

Subdivision (a)(1) requires a cause of action arising from a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state". N.Y.Civ.Prac.Law § 302(a)(1) (McKinney Supp. 1980). There is no clear test to determine whether or not such transaction has occurred. Rather, the courts have applied a "totality of the circumstances" test in making § 302(a)(1) determinations. *Sterling National Bank and Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870 (2d Cir. 1975).

Several factors have been considered by the courts in applying the "totality of circumstances" test, none of which are present in the instant case. There is no evidence of any contract or contract negotiations in New York concerning the administration of the MCAT or any other AAMC matter. *Longines-Wittnauer Watch Co. v. Barnes & Reinecke*, 15 N.Y.2d 443, 209 N.E.2d 68, 261 N.Y.S.2d 8 (1965). Nor is there any indication that AAMC officers were present in New York in an official capacity which relates to the plaintiff's alleged cause of action. *Reiner & Co., Inc. v. Schwartz*, 41 N.Y.2d 648, 363 N.E.2d 551, 394 N.Y.S.2d 844 (1977); *Hi Fashion Wigs, Inc. v. Hammond Advertising, Inc.*, 32 N.Y.2d 583, 300 N.E.2d 421, 347 N.Y.S.2d 47 (1973).

At best, AAMC has had contacts with New York by mailing applications to the state and having its MCAT administered in New York. Mere solicitation, advertising, or telephone calls to New York do not satisfy the "transaction of business" test. *Glassman v. Hyder*, 23 N.Y.2d 354, 244 N.E.2d 259, 296 N.Y.S.2d 783 (1968). *A fortiori*, in the instant case where the mailing of applications, or "solicitations" to New York are on behalf of others, AAMC cannot be deemed to have transacted business in New York. Likewise, the mere administration of the MCAT developed by AAMC by an independent testing corporation in New York is not the "transaction of business" as that term is used in § 302(a)(1). Nor can the administration of the MCAT by ACTP in New York be considered a contract by AAMC to provide "goods or services in the state." AAMC merely developed the MCAT, a test which is administered nationwide by an independent contractor. It did not contract to supply services in New York State.

Even assuming that AAMC's limited contacts with New York are sufficient to constitute "transaction of business," or "contracting to supply goods or services in the state," it is clear that plaintiff's alleged cause of action does not arise from these contacts as required by § 302(a). Certainly, plaintiff does not contend that the mere mailing of a few of his applications to schools or the mere administration of the MCAT in New York State are acts which give rise to his complaint of discriminatory admissions policies.

Similarly, *in personam* jurisdiction over AAMC in this case cannot be premised on subdivision (a)(2). That subdivision requires that the defendant commit a tortious act in New York *and* that the act cause injury in New York.

**5.** C.P.L.R. § 302 provides, in relevant part:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;

Section 302(a)(2) has been interpreted to require "that the defendant be physically present in New York when committing the tort" *Lynn v. Cohen*, 359 F.Supp. 565, 568 (S.D.N.Y.1973). There is no indication in the instant case that AAMC committed any tortious acts within the state.

 Nor is there any indication that plaintiff was injured here. Although plaintiff claims to be a New York resident, the alleged injury took place while he was applying for transfer to a United States medical school from Guadalajara, Mexico.[6]

Likewise, jurisdiction cannot be founded on § 302(a)(3). The threshold test under this section requires a tortious act committed without the state and an injury to the plaintiff within the state. In addition, it must be shown that the defendant regularly solicits business in or derives substantial revenue from New York, § 302(a)(3)(i), *or* that the consequences of defendant's activities in New York were foreseeable and that defendant derives substantial revenue from interstate or international commerce, § 302(a)(3)(ii).

I need not go beyond the threshold question here for, as noted above, there is no indication that the alleged injury, if in fact it was caused by any activities of AAMC, took place in New York. Thus, the requirements of subdivision (a)(3) have not been met.

 In sum, plaintiff has fallen far short of meeting its burden of at least establishing prima facie evidence indicating the existence of proper *in personam* jurisdiction. This conclusion takes into account the lack of specificity and conclusory nature of plaintiff's allegations related to AAMC. It has been held in this Circuit that "the bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of section 302(a)(2)." *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 93 (2d Cir. 1975). Such bland assertions must be similarly insufficient to establish jurisdiction under the other subdivisions of § 302. *Louis Marx & Co. v. Fuji Seiko Co. Ltd.*, 453 F.Supp. 385, 391 (S.D.N.Y.1978).

I conclude, therefore, that defendant AAMC's motion to dismiss for lack of *in personam* jurisdiction must be granted.

II. The Individual California Defendants

 Six individual employees of the Los Angeles, San Diego, and San Francisco branches of the University of California were among the individuals "sued in their official capacities as employees and agents of the medical schools."[7] Complaint ¶ 8. These employees are all California residents and claim that *in personam* jurisdiction over them in the instant action is improper.

Each has submitted an affidavit to the effect that they had no personal contact with Burton Selman in New York or elsewhere.[8] They further allege that the medical schools at their respective branches of the University of California maintain no general or alumni offices, representatives, or agents in New York State. It is conceded that catalogs, applications, and/or correspondence regarding admissions may occasionally be mailed by the medical school to New York. However, it appears that these individual defendants, with the possible exception of Dr. Pops, were not personally responsible or involved in such mailings.

---

**6.** Plaintiff contends that injuries to and facts relevant to other members of the class should be used in determining jurisdiction. This argument can be summarily disposed of. First, it is clear that the named class representative himself must satisfy all jurisdictional prerequisites before the action can go forward. See *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495 (7th Cir. 1972).

Second, the class has not been certified and, for reasons set forth below, will not be certified. Thus, it would be inappropriate to consider the jurisdictional basis of other class members'

claims. Finally, plaintiff has not put forward any specific factual allegations concerning other class members.

**7.** The names of these individual defendants are listed in fn. 2, *supra.*

**8.** Dr. Martin A. Pops, however, does admit that a letter over his signature was sent to plaintiff at a Cornell University Medical Center address in New York City. The letter was ultimately returned to Dr. Pops marked "returned to sender, not at this address." Pops Aff. ¶ 15.

With the exception of Drs. Krevans and Moxley, the individuals have no contacts with New York in their official capacities. Dr. Krevans indicates that he once visited two New York foundations to obtain funds for the San Francisco medical school. Affidavit of Dr. Julius Krevans (May 1, 1979) ¶ 15. Similarly, Dr. Moxley visits New York "once to twice per year" to obtain funds for the San Diego medical school. Affidavit of Dr. John Moxley (May 3, 1979) ¶ 12.

Without a doubt, it cannot be said that any of the six individuals are "regularly and systematically" doing business in New York on behalf of the University of California.

Moreover, the exercise of jurisdiction over these individuals, even under the New York long-arm statute, would be a violation of the Due Process Clause of the Fourteenth Amendment. A non-resident defendant cannot be subject to personal jurisdiction in a jurisdiction with which he does not have "minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This principle was forcefully reaffirmed in a recent decision of the United States Supreme Court. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 288, 100 S.Ct. 559, 563, 62 L.Ed.2d 490 (1980).

With the exception of an occasional visit to New York on matters unrelated to the admission procedures which plaintiff challenges, the individual California defendants have no official contacts with New York State. In fact, Drs. Mellinkoff, Pops, Spooner, and Watson have sworn that they have no contact with the State in their official capacities. Affidavit of Dr. Sherman Mellinkoff (May 2, 1979) ¶ 16; Affidavit of Dr. Martin Pops (May 2, 1979) ¶ 14; Affidavit of Dr. Charles Spooner (May 3, 1979) ¶ 15; Affidavit of Dr. John Watson (May 2, 1979) ¶ 14. These sworn assertions have not been controverted by plaintiff.

Plaintiff seems to argue that jurisdiction over the individual defendants is proper as a result of contacts which the University of California may have with New York. However, jurisdiction over the individual officers and employees cannot be predicated on jurisdiction over the University of California. See *Path Instruments International Corp. v. Asahi Optical Co.,* 312 F.Supp. 805, 810 (S.D.N.Y.1970).

Since I find that there are not sufficient contacts to satisfy the minimum due process requirements, it is unnecessary to go through a step-by-step analysis of § 302. The motions to dismiss for lack of in personam jurisdiction on behalf of Drs. Krevans, Watson, Mellinkoff, Pops, Moxley and Spooner are granted.

### III. The University of California

The Schools of Medicine of the University of California at Los Angeles, San Diego, and San Francisco are not legal entities unto themselves. Rather, they are all part of the Regents of the University of California [hereinafter referred to as the "Regents"], Affidavit of Susan Amateau, Assistant Counsel of The Regents of the University of California (May 2, 1979) ¶ 4.

As part of the Regents, the University of California defendants claim immunity under the Eleventh Amendment. In furtherance of this argument, defendants contend that the Regents is an "arm of the State" and, as such, immune from a monetary claim in federal court. Plaintiff, on the other hand, argues that the University of California medical schools are not "arms of the State" but rather analogous to local government entities with sufficient autonomy to fall outside the scope of the Eleventh Amendment.

*Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the leading case on Eleventh Amendment immunity, makes it clear that if the State is the real substantial party in interest, immunity will inure to the official, agency, or arm of the State actually named as defendant. *Id.* at 663, 94 S.Ct. at 1355. Absent an express or overwhelming implication of

waiver, *id.* at 673, 94 S.Ct. at 1360, federal courts are empowered to grant only prospective injunctive relief. *Id.* at 677, 94 S.Ct. at 1362.

■ In determining ∣ the question of Eleventh Amendment immunity, it must initially be decided whether the Regents of the University of California is, in fact, an arm or agency of the state. In making this determination, "there are many factors which must be considered . . ., the most significant [of which] is whether any liability against the agency must be paid from public funds in the state treasury." *Trotman v. Palisades Interstate Park Comm.,* 557 F.2d 35, 38 (2d Cir. 1977). See also *Edelman v. Jordan, supra.*

In his argument in opposition to Eleventh Amendment immunity, plaintiff argues that the Regents has substantial fiscal autonomy. Plaintiff's Supplemental Memorandum at 14. This argument is based, in part, on authority given the Regents to issue revenue bonds to raise funds. Calif. Educ.Code § 92435 (West 1978).

The mere fact that the Regents "may at any time and from time to time issue revenue bonds" does not negate the fact that the Regents is generally funded with public funds from the state treasury. Calif.Educ. Code § 92100 (West 1978).[9]

■ In any event, the Regents power to issue bonds is limited to "establishing any project or acquiring lands for any project . . . ." Calif.Educ.Code § 92435. Clearly, any damage claim resulting from a lawsuit such as the instant one would not be paid through such revenue bonds but from public funds.

Other factors also lead to the conclusion that the Regents is an "arm of the state" immune under the Eleventh Amendment. Article IX section 9(a) of the California constitution provides that the Regents is a constitutional corporation whose *ex officio* members include state officials such as the Governor, Lieutenant Governor and Speaker of the Assembly.[10] California statutes refer to the University of California as a state agency. *See, e. g.,* Cal.Gov't.Code § 3202(b) (West Supp. 1979).

Plaintiff, in the alternative, contends that the Regents has waived any Eleventh Amendment immunity. This argument is based initially on the fact that the Regents is vested by the California constitution with "the power to sue and be sued." Second, plaintiff argues that defendant California medical schools' participation in the federal "capitation" program constitutes a sufficient waiver.

■ Both of these arguments must be tested against the waiver standard outlined in *Edelman, supra,* to wit: a waiver will be found "only where stated by the most express language or by such overwhelming implications from the text as to leave no room for any other reasonable construction." As such, both arguments must be rejected.

■ Under the *Edelman* standard, it has continually been held that a state's waiver of immunity to suit in its own courts does not act as a waiver of immunity in federal courts unless there is a clear intent to that

9. This section reads:
 *Power to withdraw the funds of the University of California*
 Any sum of money specifically appropriated to, or for the use of, or expenditure by, the Regents of the University of California, other than money appropriated by a state budget act for the general support of the University of California, may be withdrawn at any time in its entirety from the State Treasury, at the direction of the Regents of the University of California, upon a warrant payable to the treasurer of the Regents of the University of California.

10. This factor was taken into consideration in *Trotman v. Palisades Interstate Park Comm.,* 557 F.2d 35 (2d Cir. 1977). There it was pointed out that the Commission's members were to be appointed by the Governors of New York and New Jersey. *See also Perez v. Rodriguez Bon,* 575 F.2d 21, 25 (1st Cir. 1978) where the Court said:
 The extent and nature of the Commonwealth of Puerto Rico's financial support for the University of Puerto Rico and the fact that the Commonwealth appoints the governing body of the University convinces us that the University is sufficiently an "arm" of the state.

effect. *Riggle v. State of California*, 577 F.2d 579, 585 (9th Cir. 1978). Since there is no express waiver of federal court immunity in the provision relied upon by plaintiff, his first Eleventh Amendment waiver argument must fail.

■■■ Similarly, plaintiff cannot rely on the mere receipt of federal funds by the University of California under the Public Health Services Act capitation program. Congress may condition a state's participation in a federal program on a waiver of Eleventh Amendment immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Where it has not done so, however, the mere fact of a state's participation in a federal program or receipt of federal funds is not sufficient to constitute a waiver of immunity. Accordingly, plaintiff's claims against the University of California medical schools are dismissed insofar as they seek monetary damages.

## IV. *Pendent State Claims*

Having eliminated AAMC, the individual California defendants, and the University of California for monetary claims only, I now turn to issues which concern all of the remaining defendants.

Three of the causes of action in plaintiff's complaint are based on state law. The first appears to be a claim in contract and the second, in tort. In addition, the seventh cause of action vaguely refers to individual state requirements of fairness in considering medical school applications.

■■■ First, subject-matter jurisdiction cannot obtain by virtue of diversity of citizenship due to the absence of complete diversity. This well settled rule requires that diversity jurisdiction will not lie if there is an identity of citizenship between *any* plaintiff and *any* defendant. *Strawbridge v. Curtiss*, 3 Cranch (7 U.S.) 267, 2 L.Ed. 435 (1806).

■■■ Here, plaintiff alleges his New York residence. Complaint ¶ 6. At the same time, several New York medical schools are named as defendants.[11] There being an identity of citizenship among these defendants and plaintiff Selman, diversity jurisdiction is lacking.

In addition, as will be noted below, there is no federal claim to which these state claims can be pended. Accordingly, plaintiff's first, second and seventh causes of action are dismissed for lack of subject-matter jurisdiction.

## V. Federal Claims

After examining each and every cause of action proffered in plaintiff's complaint, it becomes patent that not one fact alleged gives rise to a cognizable federal claim.

### A. Standing to Challenge Defendant Medical Schools' Tax Exempt Status

■■ Plaintiff's sixth cause of action charges that defendant medical schools operate for the benefit of a select few and consequently should not receive tax-exempt status as a charitable organization. This argument is similar to that raised in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), where several low income respondents challenged the favorable tax treatment of hospitals which did not serve indigent patients.

While not reaching the issue of whether or not a "third party [may] ever challenge IRS treatment of another," the Court did indicate that "the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924.

It is apparent that plaintiff here cannot meet the test outlined above. As in *Simon v. Eastern Kentucky Welfare Rights Organization*, one can only speculate as to whether or not a decision favorable to plaintiff would result in his acceptance to a United States medical school. It is equally

---

**11.** The New York schools named are Cornell University Medical College, Columbia University College of Physicians and Surgeons and New York University, School of Medicine.

plausible that such schools would elect to forego such favorable tax treatment rather than submit to plaintiff's suggested admission procedures. *Id.* at 43, 96 S.Ct. at 1926.

Plaintiff's lack of standing necessitates the dismissal of his sixth cause of action.[12]

B. Private Right of Action Under the Public Health Service Act

Plaintiff, in his third cause of action, argues that the Public Health Service Act, 42 U.S.C. § 292 *et seq.* [hereinafter "the Act"] was enacted, in substantial part, for the benefit of United States students studying in foreign medical schools who wish to return to this country to complete their education. As such, he contends that an implied private right of action has been created in favor of the plaintiff class.

In determining the existence of a private right of action, a court must look to four relevant factors. As outlined in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), these are:

1. Is plaintiff a member of a class for whose *especial* benefit the statute was enacted?

2. Is there any legislative intent to create or deny such a remedy?

3. Would implication of such a remedy be consistent with the legislative scheme?

4. Is the area basically a concern of state law such that inference of a federal right of action would be inappropriate?

▇▇▇ Recent Supreme Court pronouncements make it clear that the above factors are not to be given equal weight. Of primary importance is whether or not Congress intended to create the private remedy asserted. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). The starting point for any such analysis must be the language of the statute itself. *Id.*

▇▇▇ The language relied upon by plaintiff is found in 42 U.S.C. § 295f–1(b)(3). It reads, in pertinent part:

a school of medicine may not receive a grant under section 295f of this title . . . unless its application for such grant contains or is supported by assurances satisfactory to the Secretary that such school will increase its enrollment of full-time, third-year students as prescribed by subparagraph (B).

(B) The enrollment increase referred to in subparagraph (A) is an enrollment increase in a school of medicine—

(i) which is to occur in school year 1978–1979.

(ii) in the number of full-time, third-year students over the number of full-time, second-year students who successfully completed the second-year program of such school in the preceding school year and enrolled in the third-year class of such school, and

(iii) which is not less than 5 per centum of the number of—

(I) full-time, first-year students enrolled in such school in school year 1977–1978, or

(II) full-time, third-year students enrolled in such school in school year 1977–1978,

whichever is less.

Certainly, this language which merely assures the increased enrollment of third year students without even specifying that the increase be occasioned by additional transfers from foreign medical schools does not, in itself, create a private right of action.

Turning to the legislative history of the statute in question, I find that it also evinces no intent on the part of Congress to grant a private right of action.

Plaintiff and defendants disagree as to whether or not Congress intended the provisions concerning increased third year enrollment to be for the especial benefit of foreign medical students seeking transfer. Plaintiff points to one passage in the legislative history in support of his position:

---

12. Since I have determined that plaintiff lacks standing to challenge defendants' tax-exempt status, I need not determine whether or not the Commissioner of Internal Revenue is an indespensable party required to be joined.

"the legislation is designed to preserve a reasonable opportunity for U.S. citizens studying abroad to complete their medical education in the United States . . ." H.R.Rep. No. 95–707, 95th Cong., 1st Sess. (1977) at 4, U.S.Code Cong. & Admin. News 1977, p. 4133 at 4136.

Defendants, on the other hand, argue, that the legislation was at least, in part, a reaction to the "relatively uncontrolled entrance into the United States medical care system by foreign medical graduates of widely varying training, background and competence [which] is severely diluting the quality of the United States health-care system." H.R.Rep. No. 94–266, 94th Cong., 1st Sess. (1975) at 54, U.S.Code Cong. & Admin. News 1976, p. 4947, at 4996.

At the same time that Congress was trying to quell the influx of less qualified medical students from foreign schools, it was concerned that many of these students were Americans trying to come home. Certain provisions were adopted to assist these Americans. Yet, Congress stated that "[i]n authorizing grants and contracts for these purposes, the Committee in no way means to imply that it approves of the process of enrollment in foreign schools and remedial training before and during subsequent enrollment in United States medical schools." *Id.* at 59, U.S.Code Cong. & Admin. News 1976, at 5001.

It is apparent that Congress, in passing the Public Health Service Act balanced many factors. Even assuming, for the moment, that the third year provisions were created for the benefit of qualified American students at foreign medical schools, it still must be determined whether or not Congress impliedly intended to create in them a private right of action. I think not.

The Health Professions Educational Assistance Act of 1976 originally created a "match list" which identified a pool of transfer students who were to be matched with schools of medicine receiving capitation. Pub.L. No. 94–484, § 771(b)(3), 90 Stat. 2243 (1976). This provision never went into effect. Instead, the present 42 U.S.C. 295f–1(b)(3) was enacted. This com-

promise was in "respon[se] to the objections of some schools of medicine that existing law infringes on their academic freedom to apply their own selection criteria in the admissions process." H.R.Rep. No. 95–707, 95th Cong., 1st Sess. (1977) at 4, U.S.Code Cong. & Admin. News 1977, at 4136.

In recognizing medical schools' academic freedom in the selection process, Congress certainly did not intend to give "all qualified applicants who were rejected" a private right to sue. At best, § 295f–1(b) encourages United States medical schools to provide additional places in third-year classes.

In sum, there is nothing in the legislative history, explicit or implicit, which indicates a Congressional intent to create a private right of action. If anything, the change from a "match list" program for the benefit of specific applicants to the present provision is an implicit rejection of a private right of action.

## C. 1983 Claim

Plaintiff also contends in his third claim that the defendant medical schools' admission policies discriminated against him in and deprived him of a property interest without due process of law in violation of the Fourteenth Amendment.

This argument may be summarily disposed of. A § 1983 action will lie only where there has been, under color of state law, a "deprivation of any rights, privileges or immunities secured by the Constitution and laws."

 Plaintiff cannot base his § 1983 claim on the Public Health Services Act. It is well settled that jurisdiction over a § 1983 claim cannot be based on an Act of Congress unless it is one providing for the equal rights of citizens or the protection of civil rights. 28 U.S.C. § 1343; *Andrews v. Maher*, 525 F.2d 113, 119 (2d Cir. 1975). The Public Health Services Act is simply not such a statute.

In any event, there is no indication that plaintiff has been deprived of any benefits intended by Congress in enacting this legis-

lation. Congress apparently intended, at best, to provide a reasonable opportunity for American medical students studying abroad to return to United States schools. Plaintiff has not even averred that defendant medical schools failed to do so by increasing third-year enrollment as required under the Act. Disgruntled and frustrated, plaintiff is merely complaining that he could not successfully compete with other qualified applicants who were admitted as transfer students.

■ Likewise, plaintiff cannot rest his § 1983 claim on any deprivation of a Constitutional right. With mere conclusory allegations, he claims that "qualified United States citizens studying abroad" have been subjected to discrimination by defendants' admission policies. These claims fall far short of the invidious discrimination required for an actionable equal protection claim under the Fourteenth Amendment. *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

■ Plaintiff has also failed to assert a "property" or "liberty" interest whose deprivation without due process would give rise to a Fourteenth Amendment claim. It is plaintiff's contention that he has a "liberty" or "property" interest in his admission to medical school.

In making his "liberty" interest argument, plaintiff relies on *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), in which a medical student at the University of Missouri-Kansas City Medical School was dismissed for academic reasons during her final year. This case might more appropriately be cited in opposition to plaintiff's contentions.

The Court in *Horowitz* did not reach the "liberty" interest question but hinted that based on *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), a mere dismissal without the publication of harmful allegations would not deprive the respondent of an opportunity to seek admission elsewhere. Certainly, plaintiff does not contend that defendant medical schools

published any damaging information which hurt his chances for admission at other schools.

*Horowitz*, as well as the other cases cited by plaintiff, all involved deprivations occasioned by individuals who were dismissed from school or their employment. Rejection of an application for admission is a far cry from dismissal once a person has already been admitted. In *Horowitz*, the Court expressed a desire to avoid "judicial intrusion into academic decision making." 435 U.S. at 92, 98 S.Ct. at 956. *A fortiori*, a court should be more reluctant to interfere where the "interest" involved has not even risen to that of an attending student.

Turning to the "property" interest claim, it is clear that plaintiff has not met the test established by the Supreme Court to determine the existence of such an interest for due process purposes. In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), it was clearly stated that to have a property interest, "a person must have more than an abstract need or desire. . . . He must have more than a unilateral expectation. . . . He must, instead have a legitimate claim of entitlement" *Id.* at 577, 92 S.Ct. at 2709.

One would be hard pressed to come up with a better example of a case in which there is no such "legitimate claim of entitlement." Plaintiff cannot possibly be heard to say that every qualified student at a foreign medical school is *entitled* to transfer admission into a United States school.

In accordance with the reasoning above, plaintiff's third claim is dismissed.

### D. 1985 Claim

■ In his fourth cause of action, plaintiff contends that defendants conspired to adopt policies which discriminated against plaintiff, as well as the purported class, in violation of 42 U.S.C. § 1985 and that they, in fact, admitted less qualified applicants. Overt acts alleged in furtherance of this conspiracy include, *inter alia*, dissemination of misleading recruitment information and waiver of National Board passage for certain applicants.

Section 1985(3) prohibits a conspiracy to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws."

In the leading case interpreting § 1985, the Supreme Court has expressed concern that the section not become a "general federal tort law." *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Indeed, the court held that before a § 1985 action will lie, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators action." *Id.* at 102, 91 S.Ct. at 1798. The Court expressly left open the question of "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under . . . § 1985(3)." *Id.* at 102 n. 9, 91 S.Ct. at 1798.

Plaintiff contends that lower courts have answered this question in the affirmative. He points to cases which upheld § 1985 actions based on sex-based discrimination, *Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1975),[13] and religious discrimination, *Baer v. Baer*, 450 F.Supp. 481, 490–91 (N.D. Cal.1978).

Plaintiff, however, cannot contend that the class in the instant action comes even close to the traditional civil rights classes based on race,[14] religion, ethnic background, or sex. Rather, in a last-ditch effort to fit within § 1985, he argues that his class was discriminated against on the basis of "wealth and social" position. This argument, too, must be rejected.

Plaintiff has described the class as "all transfer applicants who have applied for admission to defendant medical schools pursuant to the provisions of the Federal Transfer Program, are qualified to meet all valid requirements for admission but have been rejected because of the admissions policies and practices of the defendant medical schools." Complaint ¶ 5. Nowhere in this description does plaintiff even suggest that the class may be defined according to "wealth and social" position.

Although the scope of § 1985(3) has not yet been settled, *Regan v. Sullivan*, 557 F.2d 300, 308 n. 9 (2d Cir. 1977), courts must be careful lest the Supreme Court's fear of creating a "general federal tort" statute comes to pass. "[I]t is clear that § 1985(3) is not to be extended to every class which an imaginative pleader can contrive." *Kops v. New York Telephone Company*, 456 F.Supp. 1090, 1095 (S.D.N.Y.1978), *aff'd without opinion*, 603 F.2d 213 (2d Cir. 1979). Search as I might, I am unable to find even the slightest hint of the necessary "class-based invidiously discriminatory animus" to make out a § 1985 cause of action in plaintiff's complaint.[15] To extend § 1985 to cover a claim such as the instant one would be to stretch it beyond recognition. Accordingly, plaintiff's fourth claim must be dismissed.

### E. Sherman Act

Plaintiff's fifth claim charges defendants with wrongfully engaging in "unlawful combinations, contracts and agreements in restraint of trade and commerce among the several states" in violation of 15 U.S.C. § 1. This claim must also be dismissed.

In *Apex Hoisery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), the Supreme Court discussed at length the purpose of the Sherman Act which was to

---

**13.** It should be noted that the Court in *Weise* expressly declined to rule on and left to the district court the question of "whether sex discrimination is the kind of 'class-based, invidiously discriminatory animus' necessary for a § 1985(3) conspiracy . . . ." 522 F.2d at 408–09, n. 16.

**14.** Plaintiff does make a vague and unsupported attempt to base his argument on racial discrimination. This argument may be summarily dismissed, however, as there is not even

an allegation that all members of the class come from the same racial or ethnic background.

**15.** Since I have determined that plaintiff has failed to allege sufficient invidiously class-based discriminatory animus, I need not reach the issue of whether plaintiff has pleaded the facts of the alleged conspiracy with sufficient particularity.

prevent "restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers." *Id.* at 493, 60 S.Ct. at 992. The aims of the Sherman Act, according to the *Apex Hoisery* Court, must be viewed in the context of the period during which it was enacted, to wit: the era of "trusts" and "combinations" of businesses.

The pronouncements of the Supreme Court in *Apex Hoisery* have led at least one court to conclude that

> the proscriptions of the Sherman Act were 'tailored . . . for the business world,' not for the non-commercial aspects of the liberal arts and the learned professions. In these contexts, an incidental restraint of trade, absent an intent or purpose to affect the commercial aspects of the profession, is not sufficient to warrant application of the antitrust laws.

*Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc.,* 432 F.2d 650, 654 (D.C.Cir.) (footnotes omitted), *cert. denied,* 400 U.S. 965, 90 S.Ct. 367, 27 L.Ed.2d 384 (1970).

 As plaintiff correctly points out, however, there is no blanket exemption to the antitrust laws for "learned professions." Rather, the Supreme Court recognized that professions do have business aspects. Thus, in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court held that a claim based on a minimum fee schedule for title examinations published by the Fairfax, Virginia County Bar Association fell within the scope of the Sherman Act. The Court in that case, however, was quite careful to point out that "[i]t would be unrealistic to view the practice of professions as interchangeable with other business activities" and went on to say that they "intimate[d] no view on any other situation than the one with which we are confronted today." *Id.* at 788–89, n. 17, 95 S.Ct. at 2013 n. 17.

Unlike the situation in *Goldfarb,* plaintiff does not challenge a fee schedule which would have a direct effect on the consuming public. Plaintiff here challenges a distinctly non-commercial aspect of the practice of the "learned professions;" to wit: admissions criteria.

Plaintiff alleges that by virtue of defendants' admissions policies, "the quality of care given to the public is . . . severely restricted and the costs of health services are markedly elevated." Complaint ¶ 69. Plaintiff offers no facts in support of this allegation. Moreover, the connection between defendants' admission policies and the alleged harm to the consuming public is, at best, tenuous.

 Academic admissions criteria may well have a purely incidental effect on the commercial aspects of the medical profession. They are, however, non-commercial in nature. The Sherman Act was certainly not intended to provide a forum wherein disgruntled applicants to medical school could challenge their rejections. Therefore, plaintiff's sixth claim is dismissed.

*Conclusion*

Courts are properly reluctant to intrude into the academic decision-making process except where invidious abuses are indicated. Thus, the Supreme Court recently stated that "the freedom of a university to make its own judgments as to education includes the selection of its student body." *Regents of University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2760, 57 L.Ed.2d 750 (1978).

The reluctance to intrude must be that much stronger, where, as here, the complaint is vague and overreaching. Throughout each and every claim in plaintiff's complaint, he alleges no more than the fact that he is a disappointed applicant who wishes he were able to get his medical education in the United States.

In accordance with all of the foregoing, defendants' motion to dismiss is granted and plaintiff's cross-motion to certify the class is denied.

SO ORDERED.