CIBA–GEIGY CORPORATION, Plaintiff,

v.

ALZA CORPORATION,
et al., Defendants.

Civ. A. No. 91–5286.

United States District Court,
D. New Jersey.

Oct. 23, 1992.

---

Robert Fettweis, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Newark, N.J., Hugh A. Chapin, Kenyon & Kenyon, New York City, for plaintiff.

George J. Kenny, Connell, Foley & Geiser, Roseland, N.J., Thomas V. Heyman, Jones, Day, Reavis & Pogue, New York City, for defendants.

Francis X. Dee, Carpenter, Bennett & Morrissey, Newark, N.J., Thomas D. Nevins, Broad, Schulz, Larson & Wineberg, San Francisco, Cal., for counterclaim defendant.

## OPINION

WOLIN, District Judge.

Before the Court is the motion by counterclaim-defendant, the Regents of the University of California (the "Regents"), to dismiss the counterclaim filed against it by defendants on the basis of sovereign immunity pursuant to the Eleventh Amendment. Additionally, before the Court is the motion of defendants, Alza Corporation ("Alza") and Marrion Merrell Dow Inc. ("Marrion Merrell Dow") (collectively "defendants") to dismiss the complaint on the ground that plaintiff, Ciba–Geigy corporation ("Ciba–Geigy"), has no standing to institute the present lawsuit. For the reasons expressed below, this Court will grant the Regent's motion to dismiss defendants' counterclaim under the Eleventh Amendment and will deny defendants' motion to dismiss the complaint for lack of standing.

## BACKGROUND

Ciba–Geigy commenced the present action against defendants for infringing the 5,016,652 patent (the "'652 patent"). Ciba–Geigy produces HABITROL under the '652 patent, a nicotine patch that helps people to cease smoking. It claims that defendants' NICODERM product, a nicotine patch employed to aid people to stop smoking, infringes the '652 patent.

Drs. Murray Jarvick, Karce Rose, and Jed Rose are the inventors of the '652 patent. The Veterans Administration (the "V.A."), and the Regents employed Drs. Murray Jarvick and Jed Rose while they were developing the '652 patent. Dr. Karce Rose was in private practice. Declaration of Jed E. Rose, Ph.D. ("Rose Dec.") ¶ 3.

The Regents contacted the V.A. about the V.A.'s interest in Drs. Rose's and Jarvick's inventions. Some of these inventions were disclosed in the '652 patent. In its correspondence with the V.A., the Regents suggested that the V.A. assign its rights in the inventions to its employees, the inventors. The Regents stated its intent to license the inventions. Moreover, the Regents acknowledged its obligation to administer the inventions in accordance with P.L. 98–620 (the 1984 amendment to 35 U.S.C. § 202).

The Regents noted that neither the "Transdermal Administration of Nicotine as a Cessation Smoking Aid" nor the "Method and Apparatus for Aiding in the Reduction of Incidence of Tobacco Smoking" were invented with any grant from the National Institutes of Health. The preceding inventions formed the '652 patent.

Drs. Jarvick and Karce Rose disclosed to the V.A. that they had produced the inventions (that were later described in the '652 patent) during the time that the V.A. em-

ployed them. Specifically, Drs. Jarvick and Karce Rose informed the V.A. that they developed the '652 patent using the V.A.'s facilities, during working hours, and using the V.A.'s equipment. Rose Dec. ¶ 4–5, Exhs. A, B. The V.A. decided that it had made an insignificant contribution to the '652 patent's development, and disclaimed any right it had to the invention. Accordingly, pursuant to 37 C.F.R. § 100.-6(b)(2) (now codified at 38 C.F.R. § 1.650 *et seq.*), the V.A. ceded any interest that it had in the invention to its inventors subject to a "nonexclusive irrevocable, royalty free license in the invention with power to grant licenses for all governmental purposes." Rose Dec. ¶ 9, Exh. C. Subsequently, the inventors assigned all of their rights to the '652 patent to the Regents. Rose Dec. ¶ 10, Exh. D.

Although the Regents did not receive any grant from the NIH to help it develop the inventions underlying the '652 patent, the University of California received a $4,942 Biomedical Research Support Grant from the Department of Health and Human Services to develop what became the '652 patent, Rose Dec. Exh. B, and a grant from the National Institute of Drug Abuse. Supplemental Declaration of Theresa M. Gillis ("Gillis Supp. Dec.") Exhs. 2–4. No party has produced any evidence to indicate whether the Department of Health and Human Services or the National Institute of Drug Abuse claims any interest in the '652 patent. The patent application discloses that these two agencies contributed to the patent.

The Regents gave Ciba–Geigy an option for an exclusive license to the '652 patent on June 2, 1988.[1] The original option expired on May 31, 1990. Declaration of Theresa M. Gillis ("Gillis Dec.") Exh. E. The Regents extended the option until May 31, 1992. Gillis Dec. Exh. F.

On October 29, 1991, the Regents and Ciba–Geigy entered into an exclusive licensing agreement. Pursuant to that agreement, Ciba–Geigy agreed to comply with 35 U.S.C. §§ 200–204[2]. Exclusive License Agreement § 23. These sections require an entity to "substantial manufacture" its products in the United States. 35 U.S.C. § 204. Additionally, Ciba–Geigy agreed to "reasonably fill the market demand for [the] licensed product." Exclusive License Agreement Article 6.1.

If Ciba–Geigy fails to meet these conditions, the Exclusive License agreement allows the Regents to send a written notice of default to Ciba–Geigy. The Exclusive License Agreement provides further that if Ciba–Geigy fails to cure the default "or to demonstrate that it made reasonable efforts to cure the default" then the Regents can terminate Ciba–Geigy's exclusive license. Exclusive License Agreement Articles 6.4, 9.1. Furthermore, the Regents retained certain rights concerning the patent under the Exclusive License Agreement. For example, the Regents retained a right to use the patent for "educational and research purpose." Exclusive License Agreement Article 2.3. Additionally, the Exclusive License Agreement allows Ciba–Geigy to assign the contract only with the Regents' consent. The License Agreement provides that the Regents must consent to a reasonable assignment. Exclusive License Agreement Article 18.1. The Exclusive License Agreement permits Ciba–Geigy to sub-license the patent, however, without obtaining the Regents' consent.

Finally, the License Agreement forces Ciba–Geigy to confer with the Regents before Ciba–Geigy would institute any action for patent infringement. The License Agreement prohibits Ciba–Geigy from commencing a lawsuit within five days of notifying the Regents of the alleged infringe-

---

1. Other companies sought an exclusive licensing agreement from the Regents for the '652 patent.

2. The recital clause of the License Agreement also references 35 U.S.C. §§ 200–204. Specifically, it declares that

   the development of the Invention was sponsored in part by the Veterans Administration

(VA), and the VA has determined that all rights, title, and interest in the Invention lies with The Regents, and as a consequence this license agreement is subject to overriding obligations to the federal government as set forth in Executive Order 10096 and 35 USC, 200–204.

ment without first obtaining the Regents' consent. Under the License Agreement, the Regents agreed to act as a nominal plaintiff, if it was required for Ciba–Geigy to bring an infringement action. License Agreement 15.2. Moreover, pursuant to Article 15.4 of the License Agreement, the Regents retained the right to bring its own action for patent infringement or to join a lawsuit brought by Ciba–Geigy.

After Ciba–Geigy began this action but prior to the defendants instituting their counterclaim against the Regents, Ciba–Geigy and the Regents amended Article 15 of the License Agreement. Specifically, they deleted Article 15.4 of the License Agreement and withdrew the Regents' consent to be named as a nominal plaintiff. Under the amended License Agreement, the Regents agreed not to file any patent infringement lawsuit and agreed that any judgment obtained by Ciba–Geigy in a patent infringement suit filed by Ciba–Geigy would bind the Regents. Moreover, the Regents assigned any potential causes of action "as alleged in the Alza and Elan Suits, including without limitation the right to recover for past and future damages and to obtain injunctions against infringement." Amendment to Exclusive License Agreement.

Ciba–Geigy has manufactured HABITROL pursuant to an agreement it entered with Lohmann Therapie Systeme GmbH 7 Co. KG ("Lohmann"). Under that agreement, Lohmann manufactures and assembles the active ingredients contained in HABITROL in West Germany. Ciba–Geigy and its subcontractors manufacture and assemble the inactive ingredients contained in HABITROL in the United States. Additionally, Ciba–Geigy employs the people who advertise and sell Habitrol in the United States. Declaration of Thomas M. Clausi ("Clausi Dec.") ¶¶ 3–10.

Ciba–Geigy and Lohmann have entered into an agreement under which Lohmann should manufacture Habitrol in the United States by the second quarter of 1993. Lohmann has received FDA approval to manufacture Habitrol in the United States. *Id.*

## DISCUSSION

### A. *Sovereign Immunity*

Defendants have brought a counterclaim against the Regents. In their counterclaim, defendants ask this Court to declare the '652 patent invalid and uninfringed. In response to their counterclaim, the Regents has filed a motion to dismiss, based on sovereign immunity under the Eleventh Amendment. The Regents claims that it is a constitutionally protected arm of the state of California. Furthermore, the Regents claim that neither it nor Congress has waived its sovereign immunity.

In particular, the Regents maintains that in enacting the patent laws, Congress did not intend to abrogate the sovereign immunity of the various states. Additionally, the Regents contends that California has not enacted any statute or provision in its Constitution that would subject the Regents to suit.

Furthermore, the Regents asserts that it has not consented to the instant lawsuit. In doing so, the Regents notes that in the License Agreement it had agreed to be named as a nominal party in a patent infringement action, if it was necessary for Ciba–Geigy to maintain a lawsuit against a potential infringer. Ciba–Geigy further declares that it and the Regents amended the License Agreement and deleted this provision. In the amended agreement, the Regents declared that Ciba–Geigy would maintain lawsuits for patent infringement of the '652 patent and the Regents agreed to be bound by any judgment. Accordingly, the Regents concludes that it did not waive its sovereign immunity.

For the reasons that follow, this Court finds that the Regents is an arm of California protected by the Eleventh Amendment and that the Regents has not waived its sovereign immunity.

1. **The Regents Is An Arm of California Entitled to Eleventh Amendment Protection**

█ Even if a party does not bring an action against a state itself, Eleventh Amendment immunity applies where the

state is "the real party interest." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101, n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984) for example, the Supreme Court maintained that the state is the real party in interest when " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration', or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " In addition, The Supreme Court has stated that a court should consider "the nature of the entity created by state law," *Kovats v. Rutgers, the State University*, 822 F.2d 1303, 1307 (3d Cir.1987) (quoting *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)) in order to determine whether an entity is an "arm of the state" instead of a "non-immune municipal corporation." *Id.*

Guided by the Supreme Court, the Third Circuit formulated a nine factor test to determine whether an entity is entitled to Eleventh Amendment protection. *Urbano v. Board of Managers of the New Jersey State Prison*, 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970). In announcing the test the *Urbano* court stated

> [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, none of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function;

whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation; and whether the sovereign has immunized itself from responsibility for the agency's operations.

The Third Circuit in *Fitchik v. New Jersey Transit Rail Operations*, 873 F.2d 655, 659 (3d Cir.1989), grouped these factors into three categories. The factors grouped according to their category are

(1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors-whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) The status of the agency under state law (this includes four factors-how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

(3) What degree of autonomy the agency has.[3]

Courts in other Circuits have utilized similar tests to determine whether a Court should grant Eleventh Amendment immunity to an agency. *See Vaughn v. Regents of University of California*, 504 F.Supp. 1349 (E.D.Ca.1981); *Selman v. Harvard Medical School*, 494 F.Supp. 603 (S.D.N.Y.), *aff'd*, 636 F.2d 1204 (2d Cir. 1980). Under these tests, the Regents qualifies as an alter ego of California, and is entitled to Eleventh Amendment protection.

In *Kovats*, the Third Circuit determined that Rutgers was not an arm of the state immune from suit. In doing so the *Kovats* court examined the factors announced in *Urbano*. First, the Court considered

---

**3.** The *Fitchik* court abandoned the *Urbano* factor that examined whether the agency exercised a governmental or proprietary function, because the Supreme Court rejected this distinc-

tion in *Garcia v. San Antonio Metro. Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

whether the funds that would pay a judgment would come from the state. The court noted that Rutgers "has four distinct sources of income: auxiliary income, derived from Rutgers' auxiliary services and restricted to use in funding those services which include dining services, room rentals and intercollegiate athletic programs; restricted income from moneys received from private or government groups and limited to use in the specific program generating the funds; general university income from tuition, fees, and investments; and state appropriations." *Kovats* 822 F.2d at 1308.

The court further stated that general university income and state appropriations are commingled in a separate account. Additionally, the court found that Rutgers held title to land and buildings worth more than $40 million. Moreover, Rutgers had segregated accounts of interest derived from its assets. Between 1983 and 1985, it used $44 million and $48 million of this account as a pledge to bondholders. Importantly, the court established that Rutgers retained complete control over both the commingled and segregated accounts, "subject only to audit by the state." At least equally significantly, the court recognized that New Jersey had insulated itself twice from any of Rutgers' liabilities. Accordingly, this factor weighed against immunity.

The court next considered Rutgers' status under New Jersey law. Here the court found factors weighing both in favor of immunity and against immunity. Initially, the court found that the "statute under which Rutgers is incorporated and case law state that Rutgers is an instrumentality of the State." Moreover Rutgers provides education, an essential state function. *Id.* at 1310.

Contrastingly, the Court found that the state did not consider Rutgers part of the state for New Jersey Contractual Liability Act because Rutgers can sue or be sued. Moreover, Rutgers was not subjected to civil service laws, competitive bidding laws, or administrative procedure requirements. *Id.*

Additionally, the court considered Rutgers amenability to suit and the immunities that it possessed. The court noted that Rutgers can sue and be sued in state court. On the other hand, Rutgers possessed immunity from suit in tort except under New Jersey's tort claims act. Moreover, Rutgers property was exempt from local zoning ordinances "and its property had been held to be property of the State of New Jersey exempt from property taxes." *Id.* at 1311 (quoting *Rutgers, the State University v. Piscataway Township*, 1 N.J. Tax 164, 171 (1980)).

Finally, the court considered Rutgers autonomy from the state. The court found that this factor did not favor granting Rutgers sovereignty. Initially, the court examined the composition of Rutgers government. The court noted that Rutgers was governed by two bodies: the Board of Governors, six of whom are appointed by the Governor, the remaining five are appointed by Rutgers' trustees. N.J.S.A. 18A:65–14. A Board of Trustees also governed Rutgers. The five members appointed by the governor to the Board of Governors sit on the Board of Trustees. The Governor appointed six members with the advice and consent of the senate. N.J.S.A. 18A:65–15(I)(b). The remaining twelve to twenty trustees consisted of twelve to twenty Rutgers alumni and alumnae chosen by the trustees N.J.S.A. 18A:65–15(I)(c), as well as the twenty-five charter trustees chosen when the statute converting Rutgers into a public institution passed. N.J.S.A. 18A:65–15(I)(d).

Next the court examined the duties of these bodies. Due to Rutgers previous status as a private university, the trustees "retain sole control subject to a public trust over the assets held by Rutgers prior to the [statute's passage]." N.J.S.A. 18A:65–26. Importantly, the trustees "retain[ed] power to withdraw their assets if they feel the assets are being put to an improper use." N.J.S.A. 18A:65–27(II)(c).

The court noted that in general the governors and trustees are given a great degree of self-government. The only restriction placed on these bodies was that they

must comply with the budget appropriations to the university, N.J.S.A. 18:65–25(d), and must comply with state laws and regulations. Within the broad confines of budget appropriations, however, Rutgers only needed to inform the state of its spending decisions. N.J.S.A. 18A:65–25(d).

Moreover, the court found that Rutgers money is not treated as public money. Instead, unlike other agencies, Rutgers can withdraw and invest its funds as it wishes. N.J.S.A. 18A:65–25(c). Finally, the court explained that unlike most agencies, Rutgers does not have to abide by civil service, competitive bidding or administrative procedure mandates.

Considering all these factors, the court concluded that Rutgers was not an alter-ego of the state for Eleventh Amendment purposes. The court acknowledged that Rutgers presently is "in part, a state created entity which serves a state purpose, with a large degree of state financing." More critically, however, the court also recognized that Rutgers was a private institution originally, and currently is "an independent entity able to direct its own actions and is responsible ... for judgments resulting from these actions." *Id.* at 1312.

Similarly, in *Fitchik* the court concluded that the New Jersey Transit Rail Operations, and its parent corporation New Jersey Transit were not instrumentalities of the state and, therefore, did not qualify for Eleventh Amendment immunity. As in *Kovats* the court found that the money for the judgment would not come from state's funds. In reaching this conclusion, the court noted that New Jersey Transit receives most of its money not from the state but from fares that it collects. Additionally, New Jersey Transit set aside money for paying judgments, and purchased insurance against such judgments. Importantly, as in *Kovats* the state has insulated itself from any debt or judgment that would be rendered against New Jersey Transit.

The court then considered New Jersey Transit's status under state law. The court found that this factor favored immunity slightly. The statute that created New Jersey Transit declared that it serves a "public purpose." Additionally, the New Jersey Supreme Court termed New Jersey Transit a "public" entity. Furthermore, New Jersey Transit purchased its "operating property, plant, and equipment from the State at cost. Moreover, like Rutgers it "is subject to the New Jersey Tort Claims Act, is immune from state property tax, has the power of eminent domain, and unlike Rutgers is subject to the states administrative procedure act."

On the other hand, the State of New Jersey separately incorporated New Jersey Transit; has given New Jersey Transit the right to sue and be sued; has allowed New Jersey Transit to enter into contracts; and to purchase land, stock equipment and personal property.

Finally, the court examined New Jersey Transit's autonomy. As with the its status under state law, the court found that this factor favored immunity slightly. In support of autonomy, New Jersey Transit is governed by its own board of directors. The board has significant power. For example, it could enter into contracts on New Jersey Transit's behalf, commence lawsuits, purchase insurance, collect fares and organize New Jersey Transit's management.

In support of dependence on the state, the court noted that, three of the directors are "members of the executive branch." Significantly, the Governor can veto any of the Board's actions.

The court considered all the above factors. In balance, because the court found that the most important *Urbano* factor, whether the state would pay for any judgment entered against New Jersey Transit weighed strongly against immunity, the court held that New Jersey Transit and, therefore, its subsidiary, New Jersey Transit Rail Operations Inc., was not an alter ego of the state.

The Third Circuit has also held, however, that the State System of Higher Education, an entity with a similar function to both Rutgers and the Regents, was covered by the Eleventh Amendment. *Skehan v. State System of Higher Educ.*, 815 F.2d

244 (3d Cir.1987). At the outset, the court considered the entity's status under state law. In its enabling statute the legislature termed the State System of Higher Education (the "SSHE"), a "public corporation" and "government instrumentality." Moreover, the court noted that the SSHE performs a typical state function-providing education. Furthermore, the state described its funding of SSHE as "ordinary expenses of government" and the SSHE enjoyed "preferred status for appropriations." Although the court noted that the SSHE was independently incorporated, the court did not place much weight on this in light of its governmental purpose.

The court next considered SSHE's autonomy. Pennsylvania exercised significant control over SSHE. The members of its governing body consist of two state officials and fourteen people appointed by the governor upon the advice and consent of the senate. Moreover, SSHE is not only subjected to an annual state audit but must provide an annual report to both the governor and the Appropriation and Education committees of the senate and house of Pennsylvania. Additionally, SSHE must abide by regulations that apply to Pennsylvania and its agencies for purchasing supplies, and for entering into contracts. Finally, the court found that SSHE enjoys immunity from lawsuits within Pennsylvania as well as immunity from property taxes.

■ In the instant case, an analysis of the factors set forth in and reorganized in *Fitchik* reveals that the Regents lies between Rutgers and SSHE. Because this court find that the Regents is more akin to SSHE, however, this Court holds that the Regents is an arm of the state entitled to Eleventh Amendment protection.

Initially, this court will determine the Regents' status under state law. Unlike Rutgers, California created the Regents and the trust that it administers, the University of California, through its Constitution. *See* Cal.Const. Art. IX § 9. Accordingly, courts have described the Regents as a "fourth branch of government." For example, the court in *Regents of University*

*of California v. City of Santa Monica,* 77 Cal.App.3d 130, 143 Cal.Rptr. 276 (2d Dist. 1978), stated that "[the Regents] is a branch of the state itself, a statewide administrative agency ... a constitutionally created arm of the state." *Id.,* 143 Cal. Rptr. at 279 (citations omitted). Similarly California's attorney general has opined that "[the Regents] constitutes a branch of the state government equal and coordinate with the legislature, judiciary, and the executive branch." 30 ·Ops.Cal.Atty.Gen. 162, 166 (1957). Additionally, in determining that buildings owned by the University of California were public buildings, the court in *In re Bacon,* 240 Cal.App.2d 34, 49 Cal.Rptr. 322 (1st Dist.1966), adopted the view expressed by the California Supreme Court in *Estate of Royer,* 123 Cal. 614. 621, 56 P. 461 (1899), that the University of California is a "public corporation ... [whose] property is property of the state." *Id.* Moreover, California's statutes define the Regents not as .a "local agency" but instead as a "state agency." Cal.Govt. Code § 3202(b). Its name is owned by the state. Cal.Educ.Code § 92000(a).

Due to its status as a constitutional branch of California's government and as a state agency, the Regents enjoys certain rights. For example,· the Regents can make quasi-judicial determinations to which a reviewing court will accord great weight. *See Ishimatsu v. Regents of the University of California,* 266 Cal.App.2d 854, 72 Cal.Rptr. 756, 761–763 (1st Dist.1968). Similarly, "[an internal] regulation [adopted] by the Regents can enjoy a status equivalent to that of a state statute." *Regents of University of California v. City of Santa Monica,* 143 Cal.Rptr. at 279.

The Regents possesses many immunities and privileges. For example, the Regents is protected under California's Tort Claims Act. *See* Cal. Govt.Code § 811.2. Additionally, the Regents possesses power of eminent domain. Cal.Educ.Code §§ 92040, 92439. Its property is exempt from state, local, and county taxes. Cal.Educ.Code § 92443. Moreover, the Regents is exempt from local building codes and regulations

and is exempt from permit fees and inspection fees. *Regents v. Santa Monica,* 143 Cal.Rptr. at 280–81. Revenue bonds issued by the Regents are exempt from state taxation. Consequently, this factor favors a finding of immunity.

Next this Court will determine the extent of the Regents' autonomy from the state. The California Constitution provides that The University of California shall constitute a public trust, to be administered by the existing corporation known as the "Regents of the University of California" Cal. Const. Art. IX § 9(a). California grants the Regents substantial authority to manage the University. Specifically, Article IX § 9(f) of California's constitution provides:

> The Regents of the University of California shall be vested with legal title and the management and disposition of the property of the university and of property held for its benefit and shall have the power to take and hold, either by purchase or by donation, or gift testamentary or otherwise, or in any other manner, without restriction, all real and personal property.... Said corporation shall also have all the powers necessary or convenient for the effective administration of its trust, including the power to sue and to be sued, to use a seal, and to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise.... The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its Regents and in the administration of its affairs, and no person shall be debarred admission to any department of the university on account of race, religion, ethnic heritage or sex.

Similarly, by statute the Regents has the power to "make contracts, leases and agreements including with any "state or federal agency." Cal.Educ.Code §§ 92436, 92437. Likewise, the Regents has the power to "acquire by grant purchase, gift devise, lease or by the exercise of the right of eminent domain and may hold, use, sell, lease or dispose of any real or personal property necessary for ... carrying on any of its powers pursuant to this chapter."

Cal.Educ.Code § 92431. Additionally, the Regents may convey or otherwise dispose of any of its rights, interests, or properties.... Cal.Educ.Code. § 92438.

Moreover, the Regents has complete power over construction projects. The Regents can issue Revenue Bonds, to finance construction projects. The Regents has authority to structure the terms of the bonds including using its property to secure the bonds and to redeem them. Additionally, the Regents can invest any money in a construction fund as it desires subject to limitations that it includes in indentures relating to the issuance of revenue bonds. *See* Cal.Educ.Code §§ 92441, 92482, 92525, 92532. Furthermore, surplus money from revenue bonds can be used by the Regents for any purpose. Cal.Educ.Code § 92533.

Finally any property held by the University of California, the Regents' trust, can be insured against damage or loss. Cal. Educ.Code § 92447. Additionally, the Regents may insure against public liability. Cal.Educ.Code § 92447, Likewise, the Regents can insure against loss of revenues derived from the operation of any of its projects. The proceeds of such insurance, however can only be used to pay bonds and interest thereon. Cal.Educ.Code. § 92446.

Nonetheless, the Regents autonomy is not unlimited. For example, unlike Rutgers, the Regents must comply with California's competitive bidding statutes for any project it engages in that would exceed $50,000. *See* Cal.Public Contract Code §§ 10500 *et seq.* Additionally, the Regents must submit reports to each house of the legislature "on matters pertaining to and affecting salaries, wages, hours of work, conditions of work, and other matters relating to personnel under the jurisdiction of the Regents and the employees of the University of California."

Importantly, unlike Rutgers, and similar to *Skehan* the Regents is composed overwhelmingly of governmental officials, or people appointed by the Governor with the advice and consent of the Senate. Specifically, the Regents is composed of

seven ex officio members ... the Governor, the Lieutenant Governor, the Speaker of the Assembly, the Superintendent of Public Instruction, the president and the vice president of the alumni association of the university and the acting president of the university, and 18 appointive members appointed by the Governor and approved by the Senate.... Additionally the regents may appoint a student and/or a member of the faculty of the university or of another institution of higher learning.

Cal.Const. Art. IX §§ 9(a), 9(c). *See Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1349–50 (9th Cir.1981) (Board of Regents of University of Arizona covered by Eleventh Amendment where the Regents was composed of government officials or people appointed by the governor and where the Regents had to support annual reports to the governor.).

As in *Skehan,* the Regents autonomy, and its incorporation as a public entity, stems, however, from the mandate contained in the California Constitution to ensure that the Regents performs its governmental mission, to engage in higher education, without political or sectarian influence. *See* Cal.Const. Art. IX § 9(f). *See also Jain v. University of Tennessee,* 670 F.Supp. 1388 (W.D.Tenn.1987), *aff'd,* 843 F.2d 1391 (6th Cir.1988). (Separate incorporation of state university did not detract from its status as an alter-ego of the state under the Eleventh Amendment where university was incorporated in order to pursue "the ends of higher education."). Accordingly, the degree of autonomy the Regents has weighs in favor of immunity.

Finally, this Court will consider the funding of the Regents and whether any judgment would be paid from California's funds. State and federal funding constitutes the major source for funding the University of California's operations. The University of California receives about $2.1 billion from the state. The majority of the Regents funds, however, do not come from California. Instead, about 33%, of the University of California's funding comes from the state and from general funds.[4] The Regents can increase fees to ensure funding. Fees, however, only account from about 7% of the University of California's budget. In line with its fiscal autonomy, the Regents retains control over unrestricted funds, which include state funds, subject to limitations explained below. Moreover, the Regents can purchase insurance against certain litigation risks. For example, the Regents "maintains self insurance reserves for medical malpractice claims, workers compensation claims and certain other risks." Neither the Regents nor the Auditor general has described these "other risks." Accordingly, this Court will not assume that they include a judgment for patent infringement.

On the other hand, unlike Rutgers, California has not disclaimed liability for the University of California's debts. Instead, the California Constitution mandates the state to ensure the "security of the University of California's funds." Cal. Const. Article IX § 9(a). Moreover, like the SSHE, the University of California receives preferred status for state revenues. Additionally, the Regents can only issue revenue bonds for its construction projects and not to pay its judgments.

Moreover, California exercises control over the Regents and the University of California's finances. For example, the legislature oversees the University of California's budgets and can limit the uses for state moneys appropriated to the University of California. Additionally, the legislature has "prohibited the [Regents] from expending funds for new large-scale computers ... and has required the [Regents] to use certain funds ... to support additional primary care medical residences." *Autonomy and Accountability: The University of California and the State Constitution,* 38 Hastings Law Journal 933–34 (1987) (citations omitted). Likewise, the Regents must submit reports to the State Public Works Board of any state money that it allocates for a construction project.

---

**4.** The amount of funding by the state, however, is not dispositive. *See Jain,* 670 F.Supp. at 1390 (University derives more than one-third of revenues from state appropriations.).

Cal.Educ.Code § 92101. If the Regents fails to use the money allocated for construction projects, then the money reverts to the state's General Fund. *Id.* Finally, the Regents is subjected .to audits by the state, and the financial statements of the Regents including funds that it receives from sources other than the state, is part of the annual financial report of the Auditor General of California. *See Harden v. Adams,* 760 F.2d 1158, 1163–64 (11th Cir. 1985) (State University protected by the Eleventh Amendment where university must submit its budget to the state and received appropriations from the state); *Jagnandan v. Giles,* 538 F.2d 1166, 1175 (5th Cir.1976), *cert. den.,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977) (University of Mississippi protected by Eleventh Amendment in part where University had to prepare an annual report that of its "gross receipts and disbursements" including funding from sources other than the state.). .

In light of these factors, this Court finds that the Regents is entitled to protection under the Eleventh· Amendment. The Court acknowledges that the Regents possesses a great degree of autonomy and does not receive a majority of its· funding from California. In particular, however, due to its elevated status as a "fourth branch of government" under the California Constitution, the fact that California has not detached itself from the Regents debts, and the fact that its membership consists overwhelmingly of governmental officials or people chosen by the Governor upon the consent and advice of the Senate, this Court concludes that the Regents is an arm of California.

Courts that have confronted this issue have decided that the Regents is the alter-ego of California and entitled to Eleventh Amendment protection. *See Thompson v. Los Angeles,* 885 F.2d 1439, 1443 (9th Cir.

1989) (Regents is an instrumentality of the state for Eleventh Amendment purposes.); *Vaughn v. Regents of University of California,* 504 F.Supp. at 1354 (Regents covered by the Eleventh Amendment: Regents · could not satisfy judgment from its funds, property of Regents is property of the state and Regents was not authorized to issue bonds for claims against it.); *Selman v. Harvard Medical School,* 494 F.Supp. 603 (S.D.N.Y.1980). These cases bolster this Court's decision.[5]

2. Congress has not Abrogated a State's Eleventh Amendment Immunity in Enacting the Patent Laws

■ The Federal Circuit, in *Chew v. California,* 893 F.2d 331 (Fed.Cir.), *cert. den.,* —— U.S. ——, 111 S.Ct. 44, 112 L.Ed.2d 20 (1990), held that Congress did not subject state's to suit under the patent law. In doing so, the Court noted that if Congress had intended the patent law to displace Eleventh Amendment immunity, Congress had to provide express statutory language of that intent. Because, no express language existed in the patent law, the *Chew* court concluded that Congress did not abrogate Eleventh Amendment immunity. *Id.* at 333–35. .

Congress vested exclusive jurisdiction over the patent law in federal court. Consequently, the court's decision in *Chew* left plaintiff without a remedy. This did not impact on the *Chew* court's decision. The court relied on Supreme Court decisions that refused to find that Congress destroyed a state's Eleventh Amendment immunity based solely on its decision to confer. exclusive jurisdiction over a federal statute in federal court. *Id.* at 335–36.

Unlike the instant case, the plaintiff in *Chew* did not seek declaratory relief, but instead commenced an action for money damages. The Federal Circuit, expanded

---

**5.** The Regents argues that this Court does not have to perform a *Fitchik* like analysis because this Court should accord the Regents Eleventh Amendment immunity by virtue of .its status under the California Constitution. This Court disagrees. First, the Court notes that an entities status under state law, is one factor that a court should consider and that Eleventh Amendment

immunity must be determined under federal law. *See Kovats,* 822 F.2d at 1307. Consequently, courts confronted with universities covered by a state constitution have performed the same type of analysis that the Court has undertaken. *See Estate of Ritter v. University of Michigan,* 851 F.2d 846 (6th Cir.1988); *Vaughn v. Regents of California,* 504 F.Supp. at 1352–1354.

the *Chew* holding to cases, like the present case, in which a plaintiff seeks a declaratory relief. *Jacobs Wind Electric Co. v. Florida DOT*, 919 F.2d 726, 728 (Fed.Cir. 1990). Accordingly, the Federal Circuit's decision in *Chew* applies to the case before this Court.

### C. *The Regents Has Not Waived Its Sovereign Immunity Under the Contract It Entered With Ciba–Geigy*

■ The Supreme Court has held that an entity can waive its immunity under a contract only "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981). For example, in *In re Holoholo*, 512 F.Supp. 889, 899–902 (D.Hawaii 1981), the Court found that the Regents of California had impliedly consented to suit by contract. In particular, the contract entered by the Regents contained a provision that stated the "university shall initiate, where it may legally do so, or defend litigation and claims in connection with this contract...." Accordingly, the Regents had an obligation to institute and to defend litigation.

In the instant case, under the License Agreement, the Regents agreed to act as a nominal plaintiff, if it was required for Ciba–Geigy to bring an infringement action. License Agreement 15.2. Moreover, pursuant to Article 15.4 of the License Agreement, the Regents retained the right to bring its own action for patent infringement or to join a lawsuit brought by Ciba–Geigy.

The Regents never commenced a lawsuit. Additionally, the Regents never served as a nominal party. Instead, at the time that Ciba–Geigy instituted the instant action, but prior to defendants instituting their counterclaim against the Regents, the Regents and Ciba–Geigy amended their License Agreement. Under the amended License Agreement, the Regents agreed to be bound by any judgment entered in a patent infringement lawsuit. Furthermore, the Regents withdrew its right to commence a lawsuit. Rather, pursuant to the amended License Agreement, Ciba–Geigy alone enjoyed this right.

Because the Regents amended its license agreement when Ciba–Geigy commenced this litigation, and prior to the defendant's counterclaim against the Regents, this Court finds that it must construe the License Agreement and the Amended License Agreement together. In doing so, the Court finds that the Regents has not expressly waived its sovereign immunity. Instead, the License Agreement allowed the Regents to decide at a later date whether it should commence an action and thereby waive its immunity. Moreover, under the License Agreement the Regents agreed to be named as a nominal plaintiff only when declared to be an indispensable party by a federal court. Accordingly, the Regents expressly agreed to participate in a federal action only when necessary to allow Ciba–Geigy to maintain a lawsuit.

Even if either of these provisions of the License Agreement could constitute a contractual waiver, when read with the amended License Agreement, the Court must conclude that the Regents never intended to waive its sovereign immunity. Accordingly, the instant case differs from *In re Holoholo*, in which the Regents agreed expressly to initiate and to defend against lawsuits.

### B. *Applicability of 35 U.S.C. §§ 200–204*

■ Defendants contend that plaintiff has circumvented the requirements of 35 U.S.C. §§ 200–204. According to defendants, Ciba–Geigy never intended to comply with these statutory provisions. Consequently, defendants maintain that the License Agreement is illegal and therefore unenforceable. Hence, defendants conclude that Ciba–Geigy has no basis upon which to proceed with the instant litigation.

Even if Ciba–Geigy's actions does not render the entire License Agreement void, defendants allege that Ciba–Geigy's breach of the statute transforms its exclusive license into a non-exclusive license. Because

a non-exclusive licensee cannot institute an infringement action, defendants again conclude that Ciba–Geigy has no standing to maintain this action. Before this Court can consider either of these arguments, this Court must determine whether 35 U.S.C. §§ 200–204 applies to the '652 patent that the License Agreement covers.

Thirty-five U.S.C. §§ 202–204 apply to "subject inventions." Section 201 defines subject invention as

> any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement.[6]

Regulations promulgated by the Secretary of Commerce, that cover §§ 200–204, further explain what constitutes a subject invention. In particular, the regulations state

> To the extent that a non-government sponsor established a project which, although closely related, falls outside the planned and committed activities of a government-funded project and does not diminish or distract from the performance of such activities, inventions made in performance of the non-government sponsored project would not be subject to the conditions of these regulations. An example of such related but separate projects would be a government sponsored project having research objectives to expand scientific understanding in a field and a closely related industry sponsored project having as its objectives the application of such knew knowledge to develop new technology. The time relationship in conducting the two projects and the use of new fundamental knowledge from one in the performance of the other are not important determinants since most inventions rest on a knowledge base built up by numerous independent research efforts extending over many years.

37 C.F.R. § 401.1 (1991).

In the present case, defendants contend that the '652 patent comes under the scope of §§ 200–204 because the Regents received grants related to the '652 patent from governmental agencies. In particular, defendants maintain that the University of California gave $4,920 from the Biomedical Research Support Grant, Grant No. RR5756 (the "BRSG grant"), that it received from the Department of Health and Human Services to Dr. Jed Rose. Additionally, the University of California received a grant from the National Institute of Drug Abuse (the "NIDA Grant").

Defendants simply mention these grants and declare that they helped develop the transdermal nicotine patch disclosed in the '652 patent. They then conclude that §§ 200–204 apply to the nicotine transdermal patch. They fail, however, to demonstrate that the transdermal nicotine patch disclosed in the '652 patent was "conceived" when the inventors were performing work using the grants described above or was "first actually reduced to practice" when the inventors were working under these grants.

In fact, it seems that these grants, although used for research related to the transdermal nicotine patch described in the '652 patent, are not subject inventions. The inventors of the transdermal nicotine patch, used the BRSG grant to perform a pilot study in which they applied an ointment that contained nicotine to the skin. This device differs substantially from the mechanism described in the '652 patent.

Similarly, the NIDA Grant was used by the inventors to research a person's motivation for smoking. The grant did not allow the inventors to "first reduce" the transdermal nicotine patch described in the '652

---

**6.** Under § 201 a contractor is

any person, small business, firm or nonprofit organization that is a party to a funding agreement.

35 U.S.C. § 201.

Pursuant to § 201 a funding agreement is any contract, grant, or cooperative agreement entered into between any Federal agency, other than the Tennessee Valley Authority, and any contractor for the performance of experimental, developmental, or research work funded in whole or in part by the Federal Government.

35 U.S.C. § 201.

patent to practice. Instead, it seems at most that the inventors built upon the knowledge attained from these research grants when they developed their transdermal nicotine patch. As indicated in the regulations to § 201, however, using knowledge gained from governmental research to create a related product does not transform that product into a subject invention under § 201.

Furthermore, if the grants were used to develop subject inventions, the agencies would have entered into funding agreements with the inventors. Defendants correctly define a funding agreement as

> any contract, grant, or cooperative agreement entered into between any Federal agency, other than the Tennessee Valley Authority, and any contractor for the performance of experimental, developmental, or research work funded in whole or in part by the Federal Government.

35 U.S.C. § 201.

Under 35 U.S.C. § 202(c), however, a funding agreement must contain certain provisions. For example, a funding agreement must state that the contractor can elect to retain rights to the patent. Although, defendants have produced documents that show the inventors received money from federal agencies, no party has produced any documents that contain the provisions required by § 202(c). Additionally, neither the Department of Health and Human Services nor the National Institute on Drug Abuse has made any claim to the transdermal patch involved in the instant litigation. These factors further support the inapplicability of §§ 200–204.

Nonetheless, defendants contend that this Court must find that §§ 200–204 apply to the '652 patent because plaintiff, the Regents and the inventors of the '652 patent, acknowledge that §§ 200–204 apply to the nicotine transdermal patch described in the '652 patent. Initially, defendants point out that the '652 patent states that the inventors developed it, in part, with money from the above cited grants.

Moreover, defendants note that plaintiffs and the Regents referenced §§ 200–204 re-

peatedly in the agreements they entered. In particular, the whereas clause of the License Agreement states ·

> the development of the Invention was sponsored in part by the Veterans Administration (VA), and the VA has determined that all rights, title, and interest in the Invention lies with the Regents, and as a consequence this license agreement is subject to overriding obligation to the federal government as set forth in Executive Order 10096 and 35 USC, 200–204.

The whereas clause in the Exclusive License agreement contains identical language to the whereas clause in the License Agreement. Additionally, the License Agreement requires any licensee to comply §§ 200–204. License Agreement § 23. Similarly, the Exclusive Option Agreement provides that the contemplated license would conform with Public Law 96–517, codified at 35 U.S.C. § 200, *et seq.*

Although this Court agrees that the language in the '652 patent, the Exclusive Option Agreement, and the License Agreement, support defendants' position, in light of the absence of any funding agreement that contains the provisions required by § 202 and the inability of defendants to show that the transdermal nicotine patches disclosed in the '652 patent are subject inventions, this Court concludes that §§ 200–204 do not apply to the transdermal nicotine patches described in the '652 patent. In fact, during oral argument Ciba–Geigy stated that the '652 patent disclosed multiple inventions, one of which is the transdermal patch at issue. Ciba–Geigy contends that §§ 200–204 applies to one of the other inventions described in the patent, if at all. Defendants have not rebutted these assertions.

### C. *Illegality of the License Agreement*

■ Even if §§ 200–204 apply, this does not render the License Agreement entered between Ciba–Geigy and the Regents illegal and unenforceable. The agreement that the Regents entered with Ciba–Geigy does not require Ciba–Geigy to violate §§ 200–204. Rather, the License Agreement allows Ciba–Geigy to manufacture

HABITROL in the United States. Ciba–Geigy has chosen to breach the provision of the agreement that mandates it to substantially manufacture its product in the United States and consequently has violated § 204. Courts have held that if a party can perform an agreement without violating a statute but the party chooses to abrogate the statute the party's action does not render the agreement illegal. *Du Pre v. Bogumill,* 173 Cal.App.2d 406, 343 P.2d 415 (2d Dist.1959); *Macco Const. Co. v. Farr,* 137 F.2d 52 (9th Cir.1943).

For example, in *Du Pre,* plaintiff sold defendant a bar. Under California law a person who operates a bar must have a license. Defendant never obtained the license. Plaintiff sued defendant to enforce the contract. Defendant alleged that because it violated the statute the contract was illegal and unenforceable. The court held that the contract was not illegal because defendant could have chosen to obtain a license. *Id.,* 343 P.2d at 420–21.

In the instant case, Ciba–Geigy could have chosen to conform with the License Agreement and commence manufacturing HABITROL when it had manufacturing facilities in the United States. Accordingly, as in *Du Pre,* Ciba–Geigy's decision to manufacture HABITROL in Germany does not create an illegal contract.[7]

█ Even if the entire contract is not illegal, defendants argue that Ciba–Geigy's actions convert its license into a non-exclusive license. Because a non-exclusive licensee cannot maintain an infringement action, defendants conclude that Ciba–Geigy has no standing to commence the instant lawsuit. For reasons explained in more detail below, an exclusive licensee who has sufficient rights to enable it to maintain an infringement action does not lose that ability because a condition subsequent would destroy its exclusive license.

A party like Ciba–Geigy who does not substantially manufacture its product in the United States in accordance with § 204 does not automatically lose its exclusive license. Instead, under § 203 the federal agency which is a party to a funding agreement can exercise its march-in rights and grant additional licenses to "responsible applicants." The agency cannot grant these licenses unless it complies with regulations promulgated under § 203. These regulations provide that the agency must notify the contractor of its intention to exercise its march-in rights. Before the agency can grant additional licenses, however, the agency must conduct a hearing. 37 C.F.R. § 401.6 (1991).

█ Importantly, the agency does not have to exercise these rights. Moreover, because no private right of action exists under §§ 200–204, no party can force the agency to grant additional licenses. *See Platzer v. Sloan–Kettering Institute for Cancer Research,* 787 F.Supp. 360 (S.D.N.Y.1992); 1980 U.S.Code Cong. and Admin.News 6460, 6474 ("Agency failure to initiate a march-in proceeding in response to a petition is not a determination appealable"). Accordingly, if Ciba–Geigy fails to conform with § 204, it can lose its exclusive license if the appropriate governmental agency exercises its march-in rights. Because no governmental agency has started these proceedings, Ciba–Geigy still retains its exclusive license.[8]

---

**7.** Defendants cite cases that allow a court to consider extrinsic evidence to show that although a contract is legal on its face, the parties really entered the contract to violate the law. *See Homami v. Iranzadi,* 211 Cal.App.3d 1104, 260 Cal.Rptr. 6 (6th Dist.1989) (contract whose purpose is to avoid tax laws is illegal); *May v. Herron,* 127 Cal.App.2d 707, 274 P.2d 484 (1954) (contract whose purpose is to use improperly use veterans priority to aid non-veteran is illegal). Defendants merely assert conclusory statements that the Regents must have known Ciba–Geigy intended to violate § 204. These conclusory statements do not show that the parties intended to violate § 204.

**8.** Defendants cite cases in which the court declared a contract illegal and unenforceable where the purpose of the contract was to violate a statute. Courts declared these contracts unenforceable even though the statute violated did not provide this remedy. Relying on these cases, defendants conclude that this Court should declare the exclusive license unenforceable because Ciba–Geigy never intended to comply with § 204. *See e.g. United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *Severance v. Knight–Counihan Co.,* 29 Cal.2d 561, 177 P.2d 4 (1947).

### D. *Ciba–Geigy's Standing to Sue under the License Agreement*

■ Alternatively, defendants argue that the License Agreement does not provide Ciba–Geigy with standing to file suit. Specifically, defendants contend that the suit cannot proceed without joinder of the Regents. Accordingly, defendants maintain that the Regents is a necessary party under Federal Rule of Civil Procedure ("Rule") 19(a) and that the Regents should join the instant action. Moreover, defendants conclude that the Regents is an indispensable party under Rule 19(b). Consequently, they maintain that if the Regents is immune from suit, this Court must dismiss the instant complaint.

Whether Ciba–Geigy has standing to commence an action without the Regents depends on the rights granted to Ciba–Geigy under the License Agreement. In the seminal case of *Waterman v. Mackenzie* 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), the Supreme Court delineated the different types of interests in a patent that a licensor could convey to a licensee. The Supreme Court stated

> The patentee or [its] assigns may by instrument in writing, assign, grant, and convey, either 1st the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent and no right to

sue at law in his own name for infringement.

*Id.* at 255, 11 S.Ct. at 335. Additionally, the Court noted that the term given to the agreement through which a patentee or his or her assigns transfers rights to a patent does not determine the transfer's legal effect. Instead, the Supreme Court cautioned that a court must examine the provisions contained in the agreement. Moreover, the *Waterman* Court held a condition subsequent upon which rights to a patent terminate does not prohibit the transfer of rights from being an assignment. *Id.* at 256, 11 S.Ct. at 335.

Courts construing whether a contract provided a licensee with enough rights to the patent to enable the licensee to bring a lawsuit have examined whether the transferor granted the transferee "essential rights to the patent." These rights are the "right of exclusivity, the right to transfer and **most importantly** the right to sue infringers." *Calgon Corp. v. Nalco Chemical Co.*, 726 F.Supp. 983, 986 (D.Del.1989) (citing *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 35–39, 43 S.Ct. 254, 256–57, 67 L.Ed. 516 (1923); 2 P. Rosenberg *Patent Law Fundamentals*, § 16.01[1][a], at 16–4 (1989 rev.) (emphasis added)).

For example, guided by the *Waterman* Court, the Federal Circuit in *Vaupel Textilmaschinen Kg v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (Fed.Cir.1991), concluded recently that a patent owner transferred substantial rights to the patent thereby allowing its licensee to bring an infringement action without joining the patent owner. In doing so, the Court examined the various agreements that the parties entered. The Court scrutinized these agreements in order to distill whether the parties intended to transfer sufficient rights in the patent to allow the licensee to

---

The cases cited by defendants are distinguishable from the instant case. In those cases, the statutes provided penal penalties. Based on these penalties, courts concluded that the legislature intended to declare any contracts that violate these statutes unenforceable. In the in-

stant case, however, transgressing § 204 does not carry a penal penalty. Instead, at most, the statute renders an exclusive license non-exclusive. Therefore, even if the License Agreement is an illegal contract, this Court would still not declare Ciba–Geigy's exclusive license void.

commence a lawsuit in its own name.[9] *Id.* at 874.

The initial agreement executed in 1973, provided the licensee with the exclusive right to use the patent. It did not provide it with the right to make or vend the patent. Additionally, it did not allow the licensee to commence an action against a potential infringer. *Id.* The parties amended their initial agreement during January 1977. Under the modified agreement, the licensee obtained the right to make and distribute the product disclosed under the patent. *Id.*

A subsequent agreement endorsed by the parties allowed the licensee to "make, have made, use, sell lease, rebuild and maintain in the United States and its territories weaving machines which practice the inventive method and apparatus covered by the claims of the patent." Importantly, this agreement granted the licensee the sole right to sue for "past present and future infringement." In order to exercise its right to commence litigation, the licensee had to notify the patentee that it intended to bring a lawsuit. *Id.*

In addition to describing the rights to the patent that the patentee transferred, the *Vaupel* court also examined the rights that the patent owner retained. In particular, the patentee retained the right to veto any potential sublicensee selected by the licensee. Moreover, in the event that the licensee ceased producing the patented product or declared bankruptcy, the exclusive license agreement terminated automatically. Finally, the patent owner retained the right to receive any damages that a court awarded to its licensee. *Id.* at 875.

The *Vaupel* court held that these rights did not compel it to hold that the licensee could not maintain an action in its own name. In particular, the court found that the "sublicensing veto was a minor derogation from the grant of rights," that did not "interfere with the full use by [the licensee] of the exclusive rights [to make use and vend] under the patent." Moreover, the court noted that the right to receive damages and to terminate the license upon the occurrence of a condition subsequent comported with an assignment of the patent.

The court placed importance on the patentee's grant of its right to sue for infringement of the patent. The court reasoned this transferred right was of particular significance because "the policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer." Even though the exclusive license agreement required the licensee to notify the patent owner of its intent to commence an action, the court found this did not impinge on the licensee's right to maintain an infringement action.

Based on the rights granted to the licensee that allowed it standing to maintain an action in its own name, the *Vaupel* court found further that the patent owner was not a necessary party under Rule 19. Fed. R.Civ.P. 19(a).[10] In particular, the court found that "complete relief could be accorded to the parties currently in the lawsuit" and that no party to the lawsuit was subjected to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *Id.* at 876. Because the patent owner was not necessary under Rule 19(a), the court did not have to consider whether the owner was subject to ser-

---

**9.** As in *Waterman,* the Court noted that the agreement did not have to constitute a formal assignment in order for the patent owner to constitute effectively an assignment.

**10.** Rule 19(a) provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already par-

ties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

vice and if not whether it was an indispensable party under Rule 19(b).

Similarly, in *Surgical Laser Technologies v. Laser Industries and Sharplan Lasers Inc.*, 21 U.S.P.Q.2d 1593, 1991 WL 255827 (1992), the Court held that an exclusive license agreement, provided the licensee with sufficient rights to maintain an action in its own name. Consequently, the court as in *Vaupel* concluded that the patent owner was not a necessary party under Rule 19((a). Subsequently, the court refused to dismiss the action under Rule 19(b) for failure to join an indispensable party.

The facts in *Surgical Laser Technologies* are similar to the present action. In *Surgical Laser Technologies* the University of Washington owned the patent and entered into an exclusive license agreement with a commercial manufacturer. Under their agreement the University of Washington retained certain rights to the patent.

The court followed the *Vaupel* court and examined both the rights granted to the licensee under the exclusive license agreement as well as the rights that the licensor retained in order to determine whether the licensee had to join the patent owner in the lawsuit. The exclusive license agreement gave the licensee the right:

(1) to make, have made, use and sell products worldwide that were covered by the University of Washington's patent rights

(2) to grant one or more sublicenses to make have made use and sell licensed products covered by the University of Washington's patent rights

(3) to bring in its own name or if required by law jointly with the University of Washington a suit for infringement of the licensed patent rights including the right to sue for past infringement of the licensed rights

(4) to enjoin infringement and to collect damages, profits, and awards of whatever nature recoverable for infringement

(5) to settle any claim or suit for infringement of the patent by granting he infringing part a sublicense for the patent.

The University Washington retained

(1) a personal right to make have made use and publish licensed products of the patents 'for purpose of scholarly research or on behalf of the University of Washington only and for no other purpose'

(2) a right to practice under the patent rights and to use and distribute to third parties the licensed products for its own non-commercial research purposes

(3) to consent, which consent shall not be unreasonably withheld, to any consent judgment or other voluntary final disposition of any suit brought by the licensee

(4) to intervene in a declaratory action alleging invalidity or non-infringement brought against the licensee within 30 days of its commencement and to take over the sole defense of the action at its own expense.

Despite the rights retained by the University of Washington to make and to use the patent, the Court concluded that the University of Washington transferred substantial rights to the patent. Moreover, the rights that the University of Washington retained to consent to any voluntary disposition of an action commenced by the licensee and to intervene in an action for invalidity or non-infringement brought against the licensee did not interfere substantially with the licensee's right to sue. Additionally, the University's willingness to consent to a lawsuit if necessary did not concern the court. Consequently, the Court held that the licensee was in effect an assignee of the patent.

Furthermore, the court found that the licensee protected the University of Washington's remaining rights in the patent adequately. Moreover, given the rights to the patent that the University of Washington granted to the plaintiff, the court held that the University of Washington's absence satisfied none of the requirements of Rule 19(a). Accordingly, the Court held that the University of Washington was not a necessary party to the action. Consequently, the court never had to consider whether the University of Washington's immunity

from suit made it an indispensable party under Rule 19(b).

In the instant case as in *Vaupel* and *Surgical Laser Technologies*, the agreements entered into between the Regents and Ciba–Geigy reveal that Ciba–Geigy can maintain a lawsuit without joining the Regents. In particular, this Court finds that the Regents transferred substantial rights to exclusivity, to transfer, and to institute a lawsuit under the patent. Because the Regents transferred such rights to Ciba–Geigy, this Court further finds that the Regents is not a necessary party to this action under Rule 19(a). Accordingly, this Court does not reach the issue of whether the Regents, who is not subject to this Court's jurisdiction, would be an indispensable party under Rule 19(b).

■ The Regents granted Ciba–Geigy substantial rights to the patents' exclusivity. The license agreement provides Ciba–Geigy with "an exclusive license ... to make, have made, use, and sell any material or product that is covered by [the patent issued to the Regents]." Defendants maintain, however, that the Regents retained enough rights to the patent to deprive Ciba–Geigy of exclusivity. In particular the Regents contends that the license agreement allows the Regents to "grant additional licenses [pursuant to the license agreement] because Ciba–Geigy is not manufacturing Habitrol in the United States ... [and] because Ciba–Geigy has been unable to fill the demand for the product." Defendants' Memorandum in Opposition to the Motion to Dismiss Counterclaim Against Counterclaim–Defendant and in Support of Cross–Motion to Dismiss Complaint by Ciba–Geigy for Lack of Standing at 16.

At the outset, this Court notes that the occurrence of a condition subsequent that can terminate an exclusive license agreement has no bearing on whether the patentee transferred exclusive rights to the patent. *See Waterman*, 138 U.S. at 256, 11 S.Ct. at 335; *Vaupel* at 875. Additionally, contrary to defendants' assertion the condition subsequent has not occurred.

Defendants contend correctly that § 6 of the License Agreement provides that if the licensee is "unable to reasonably fill the market demand for the Licensed Product following commencement of marketing for any unreasonable period of time during the exclusive period of this Agreement; then the Regents shall have the right to convert this License in the United States to a non-exclusive license in accordance with paragraph 9.1." Section 23 of the License Agreement further provides that if the licensee cannot meet the statutory requirements set out in 35 U.S.C. §§ 200–204, which includes substantially manufacturing the Licensed Product in the United States then the Regents can terminate the exclusive license agreement, in accordance with § 9.1 of the License Agreement.

Under § 9.1, the Regents can convert the exclusive license, upon one of the preceding conditions only if it first gives written notice of the default. The Regents has the right to terminate the Exclusive License only if Ciba–Geigy has failed to cure such default "within 60 days of the effective date of the notice." In the instant case, the Regents has never sent a notice of default. Accordingly, at this time the Regents has no right to terminate Ciba–Geigy's exclusive license. Consequently, even assuming that Ciba–Geigy has breached §§ 6 and 23 of the License Agreement, at the present time, this has no effect on Ciba–Geigy's Exclusive License. Therefore, this Court finds that §§ 6 and 23 do not impair Ciba–Geigy's right to its exclusive license.

Moreover, the Regents retained the right to use the patent for educational purposes. As in *Surgical Laser Technologies*, however, this right does not substantially detract from Ciba–Geigy's exclusive right to commercialize the patented product. Similarly, the government's retained right to a non-exclusive license for its own use does not substantially interfere with Ciba–Geigy's rights to exclusivity. Instead, this non-exclusive right is consistent with Ciba–Geigy's standing as the exclusive licensee able to market, make and sell the patented product. In fact, courts have held that an exclusive licensee's rights to exclusivity are

not substantially altered where the patent owner had granted other entities non-exclusive licenses to the patent and the exclusive licensee's rights are conditioned on these entities exercising the rights granted to them previously. *See Waterman,* 138 U.S. at 261, 11 S.Ct. at 337; *Refac International Ltd. v. Visa USA,* 16 U.S.P.Q.2d 2024, 2027–28, 1990 WL 130032 (N.D.Cal.1990). Therefore, this Court finds that the Regents granted Ciba–Geigy the right to exclusivity.

Additionally, this Court finds that the Regents granted Ciba–Geigy substantial rights to transfer the patent. The License Agreement permits Ciba–Geigy to sub-license the patent without any consent from the Regents. Moreover, the License Agreement allows Ciba–Geigy to assign its rights under the patent. The Regents has retained the right to consent to the assignment. The Regents, however, cannot unreasonably withhold its consent.

In *Vaupel* the Court examined the ability that the Licensee had to transfer the patent rights. Although the licensor could veto any sublicense that the licensee granted, the *Vaupel* court concluded that this did not interfere substantially with the licensee's rights under the patent. *Cf. Bell Intercontinental Corporation v. United States,* 381 F.2d 1004, 180 Ct.Cl. 1071 (1967) (Court found that transfer of patent rights amounted to a sale for tax purposes even though patent owner forbade exclusive licensee from assigning its interest to anyone other than a party to whom licensee sold its assets and good will. Court reasoned that such a restriction "was a reasonable method to protect the [licensor's] rights to receive royalty payments.").

In contrast, the court in *Refac* found that an exclusive licensee did not retain sufficient rights to maintain a lawsuit without joining the patent owner. In that case, the licensor prohibited the licensee from assigning its rights to anyone other than a successor company of the licensee. Similarly in *Calgon Corp. v. Nalco Chemical Co.,* the court found that an exclusive licensee had no standing to bring a lawsuit without joining the patent owner partly because the exclusive licensee did not receive a right to transfer the patent. Specifically, the patent owner had to consent to any assignment. Because rights to a patent are analogous to rights to personal property, the court considered the right to assign the patent an essential right of ownership. 726 F.Supp. at 986.

The court can distinguish *Refac* easily. In the instant case, the licensor does not have an unrestricted right to veto any assignment of the patent. Instead, the Regents can only withhold its consent reasonably. Because the Regents does not intrude sufficiently upon Ciba–Geigy rights to transfer the patent, this Court finds as in *Vaupel,* that Ciba–Geigy possesses sufficient rights to transfer the patent.

Finally, from considering the various agreements that Ciba–Geigy and the Regents entered, this Court finds that the Regents granted Ciba–Geigy the particularly important right to sue potential infringers. The License Agreement limited Ciba–Geigy's right to maintain a lawsuit. Under the License Agreement, the Regents agreed to act as a nominal plaintiff, if it was required for Ciba–Geigy to bring an infringement action. License Agreement 15.2. Moreover, pursuant to Article 15.4 of the License Agreement, the Regents retained the right to bring its own action for patent infringement or to join a lawsuit brought by Ciba–Geigy.

Significantly, after Ciba–Geigy began this action but prior to the defendants instituting their counterclaim against the Regents, Ciba–Geigy and the Regents amended Article 15 of the License Agreement. Specifically, they deleted Article 15.4 of the License Agreement and withdrew the Regents' consent to be named as a nominal plaintiff. Under the amended License Agreement, the Regents agreed not to file any patent infringement lawsuit and agreed that any judgment obtained by Ciba–Geigy in a patent infringement suit filed by Ciba–Geigy would bind the Regents. Moreover, the Regents assigned any and all potential causes of action "as alleged in the Alza and Elan suits" to Ciba–Geigy.

Subsequently, the Regents granted Ciba–Geigy the exclusive right to sue infringers, for past present and future infringement. Even under the amended license agreement, however, the Regents retained certain rights prior to Ciba–Geigy instituting a lawsuit. In particular, the License Agreement provides that Ciba–Geigy must confer with the Regents before Ciba–Geigy would institute any action for patent infringement. The License Agreement prohibits Ciba–Geigy from commencing a lawsuit within five days of notifying the Regents of the alleged infringement without first obtaining the Regents' consent. Moreover, the Regents retains the right to defend itself if Ciba–Geigy fails to timely defend the Regents.

This Court finds that these retained rights do not limit Ciba–Geigy's particularly significant right to bring a lawsuit. For example, in *Vaupel* the licensee had to notify the licensor prior to commencing a lawsuit. The court, however, did not find that this requirement abrogated the licensee's right to bring a lawsuit in its own name. Instead, the court found that the exclusive license provided the licensee with sufficient rights to foreclose the possibility that an infringer would face suits from both the licensee and the patent owner.

Additionally, in *Surgical Laser Technologies* the licensor retained the right to reasonably consent to any settlement and to bring an action to defend itself in a suit for non-infringement and invalidity. The court found, however, that these retained rights did not make the licensor a necessary party to a lawsuit.

In the instant case as in *Vaupel*, Ciba–Geigy's obligation to notify the Regents of any suit and to wait five days prior to bringing a lawsuit does not interfere substantially with Ciba–Geigy's right to bring a lawsuit. Moreover, the Regents ability to maintain a defense if Ciba–Geigy refuses to timely do so does not encroach substantially on Ciba–Geigy's right to maintain an action. Importantly, none of the rights retained by the Regents threatens a defendant with multiple suits. Consequently, Ciba–Geigy has substantial rights to exclu-

sivity, to transfer, and to maintain an action. Accordingly, Ciba–Geigy has standing to commence the instant action.

Similarly, this Court finds that the Regents is not a necessary party to this suit under Rule 19(a). Specifically, this Court finds that complete relief can be afforded to the parties without the Regents' joinder. Moreover, this Court finds that defendants would not be subjected to multiple lawsuits if the Regents was not joined. Finally, this Court finds that Ciba–Geigy protects the Regents interest in the lawsuit adequately. Accordingly, this Court does not have to determine whether the Regents could have been an indispensable party.

█ Although the amended agreement granted Ciba–Geigy the sole ability to sue a potential infringer, the parties did not execute this amendment until six and one half months after Ciba–Geigy brought its action against the defendants. They entered into the amended agreement, however, prior to defendants' counterclaim against the Regents. The parties agreed that the amendment should be effective as of the October 29, 1991, the date they executed the License Agreement. Accordingly, at the time Ciba–Geigy instituted suit against defendants, the Regents had a right to maintain its own action and therefore, could have subjected defendants to multiple lawsuits. Therefore, this Court must decide whether it should apply the amended agreement retroactively. If this Court applies the amended agreement retroactively, then Ciba–Geigy would have standing to institute this action and the Regents would not be a necessary party.

Courts that have confronted this issue have disagreed. For example, in *Afros S.P.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402 (D.Del.1987), *aff'd*, 848 F.2d 1244 (Fed.Cir.1988), the court held that the licensee had no standing to bring an action when the patent's assignment did not become valid until at least seven months after the licensee instituted a counterclaim. Under West German law the assignment related back to the day the licensee instituted the counterclaim. Despite the relation back of the assignment under West Ger-

man law, the court held that the licensee had to have standing on the date that it brought its lawsuit.

The court noted that the patent laws allow only an assignee or patent owner to commence a lawsuit in order to ensure that the dispute would be "completely adjudicated." According to the court, allowing a licensee to sue "would give the patentee an opportunity without expense to himself to stir up litigation by third persons that is certainly contrary to the purpose and spirit of the statutory provisions for the assignment of patents." *Id.* at 1445 (*quoting Crown Die & Tool Co.*, 261 U.S. at 39, 43 S.Ct. at 257). Consequently, the court reasoned permitting a licensee to institute a lawsuit on the ground that an assignment of the patent to the licensee subsequently became valid would enlarge the class of people who could maintain patent actions impermissibly. In fact, the court maintained that such a rule would allow parties to manipulate the extent of their liability pending the lawsuit. *Id.* at 1446.[11] *See also Switzer Brothers, Inc. v. Byrne*, 242 F.2d 909 (6th Cir.1957) (Patent owners assignment of patent to licensee two years after suit was commenced by licensee did not cure defect in standing at time of lawsuit.); *Clayhill Resources, Ltd. v. MSB Industries, Inc.*, No. 80 Civ. 11645 (RLC) (S.D.N.Y. Nov. 3, 1980).

Contrarily, in *Procter & Gamble v. Kimberly–Clark Corp.*, 684 F.Supp. 1403 (N.D.Tex.1987), the court held that where a licensor assigned its interest in the patent a few weeks after the licensee commenced suit, the licensee had standing to bring the action even though when the plaintiff instituted the lawsuit it was a "mere licensee" of the patent. In *Procter & Gamble*, the owner of the patent granted plaintiff "its

entire right title and interest in the patent." The owner also assigned plaintiff the right to bring suit for past, present and future patent infringement. *Id.* After the licensee instituted the lawsuit, the defendant brought a counterclaim to join the patent owner. The patent owner moved to dismiss the counterclaim.

In concluding that the licensee had standing to maintain the lawsuit and that the patent owner did not have to join the lawsuit, the court expressly declined to follow *Switzer*. Instead, the court noted that patent owners were dismissed from lawsuits when the patent owner assigned its rights to the patent during the pendency of the lawsuit. *Id.* at 1406–07 (*citing Irving Air Chute Co. v. Switlik Parachute & Equipment Co.* 26 F.Supp. 329, 330 (D.N.J.1939); *Robert L. Ferman & Company v. General Magnaplate Corporation*, 33 F.R.D. 326, 329 (D.N.J.1963). Guided by these decisions, the court reasoned that forcing a party to join a lawsuit who has no real interest in the patent would simply "exalt form over substance." Accordingly, the court found that the assignee had standing to maintain a suit without the joinder of the patent owner.

Moreover, the court held that Rule 19 did not compel it to join the patent owner as a party to the lawsuit. The court noted complete relief could be accorded among the parties involved in the lawsuit. The court found further that the parties would not be subjected to multiple lawsuits if the patent owner was not a party to the action, and that the patent owner's rights were protected adequately despite its absence from the lawsuit.[12] *Cf. Erbamont Inc. v. Cetus Corp.*, 720 F.Supp. 387 (D.Del.1989) (Court held that licensee had standing to maintain suit and that patent owner and licensor

**11.** The *Afros* court noted that the Federal Circuit had not confronted this issue. Because of the dearth of authority, the court considered the merits of the motions before it. The Federal Circuit subsequently affirmed the *Afros* court on the merits of its decision without opinion.

**12.** Defendants argue that *Procter & Gamble* is distinguishable from the instant action because the plaintiff was an assignee of the patent whereas in the present case Ciba–Geigy is only a

licensee. As discussed above, this Court finds that the Regents transferred substantial rights to the patent to Ciba–Geigy. Accordingly, this Court concludes that Ciba–Geigy can maintain an action in its own name. As further discussed above, whether the parties refer to the rights conveyed as a "license" or "assignment" has no bearing on the type of rights conveyed. Instead the court must examine the specific rights transferred.

were not indispensable parties in part because patent owner and licensor agreed to submit affidavits in which they averred that they would be bound by any judgment entered against them. Court also noted that res judicata would probably bar subsequent lawsuits); *Catanzaro v. International Telephone & Telegraph Corp.*, 378 F.Supp. 203 (D.Del.1974) (co-owner did not have to join co-owner in patent infringement suit where co-owner agreed, in an affidavit, not to institute any further suit, where court found that stare decisis would discourage any further lawsuits, and where alternative forum would allow plaintiff to join co-owner.).

In light of the above discussion, this Court finds that the amended agreement relates back to the day that plaintiff instituted the lawsuit. The Court notes that as in *Procter* the patent owner has no real interest in the lawsuit. Accordingly, to force the Regents to join the instant lawsuit or to dismiss the lawsuit at this juncture because it is an indispensable party would only "exalt form over substance." Significantly, due to the rights in the patent that Ciba–Geigy currently possesses, if this court dismissed the action, Ciba–Geigy could simply reinstitute the lawsuit.

This Court further finds that its ruling upholds the policy for only allowing an assignee or owner to commence a lawsuit. Due to the rights to bring a lawsuit that the Regents transferred to Ciba–Geigy in its amended agreement, continuing the lawsuit without joinder of the Regents will allow the Court to litigate all the rights to the patent without fear of the Regents bringing a subsequent lawsuit.

Finally, unlike the *Afros* court this Court does not believe its ruling will impermissibly expand the types of entities that can bring infringement actions or will create manipulative situations. Instead, this decision would force patent owners and licensees to examine their relationship after the licensee institutes a lawsuit. If the patent owner intended to transfer substantial rights to the patent, then the patent owner and the licensee could clarify this during the pendency of the lawsuit and thereby defeat a motion to dismiss for lack of standing.

## CONCLUSION

For the reasons discussed above, this Court will grant the Regents motion to dismiss based on sovereign immunity and will deny defendants' motion to dismiss for lack of standing.